# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

April 29, 2022

**By ECF and Email**
Honorable Lewis A. Kaplan
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:     United States v. Jeremy Spence
        21 Cr. 116 (LAK)

Dear Judge Kaplan,

    When Jeremy Spence committed this offense, he was 21-22 years old. After growing up in a supportive, middle-class family that prioritized education, and excelling in high school, the quiet and smart and introverted Jeremy enrolled in NYU. While there, he started working for a tech start up; his intelligence and initiative made the working world very appealing to him and he soon left school to work full time. He also became intrigued by the then-brand-new world of cryptocurrency.

    Jeremy tried to learn everything he could about crypto. He quickly and easily learned to navigate the emerging crypto trading platforms. He posted about his early investment successes on social media and other online applications. Soon, he was being asked to invest in cryptocurrency for others – which he proceeded to do at a prodigious rate.

    The crypto markets in which he was investing were highly volatile and the fora in which they were traded were highly unregulated and casual. Business was done via screennames instead of real names; cartoon graphics were used instead of words; sentences were written in text-abbreviations and in all lower-case letters; profanity and insults abounded. Yet, despite the casual nature of the participants' interactions and the faux-world nature of the online world, there was real money involved.

    Jeremy was soon in over his head. In the real world, in traditional markets, no company would ever have entrusted him with that level of responsibility. No customers in traditional markets would ever have entrusted him with that amount of money. But the online world was different. Sophisticated and well-off investors invested real money with Jeremy's online cartoon avatar. At 21, he was ill-equipped to be running the scope of business that he found himself running – and frankly, he failed.

Failing in business is, of course, not a crime. The crime occurred when Jeremy attempted to cover for his mistakes. He posted false information and false assurances on his online portals to hide the truth of the losses he was incurring. He believed that if people kept investing, he could make everyone whole. Unfortunately, that was extremely naïve. He lost more and more money until he finally fessed up to his actions. He ultimately announced that the money was lost in the markets. He was out of business. He was sued repeatedly by the investors and by the CFTC. At 25 years old, he owes approximately 3 million dollars in restitution, which he will be paying off for much of his adult life.

Jeremy undoubtedly hurt people financially. But he did so at no financial gain to himself. The money wasn't stolen or secreted away; it was lost in new, unregulated, volatile markets after it was entrusted to a 21-year-old college drop-out who should never have had that much responsibility in the first place.

For his crime, Jeremy pled guilty to a felony – the only criminal conviction of his life. That felony, his punishment therefore, and his restitution obligation will forever change the course of his future. Jeremy is deeply remorseful for his actions and he wishes that he could go back and undo all of the bad choices he made.

Today, at 25 years old, he still has great potential to atone for his mistakes. He aspires to finish college and study science and devote his intellect and his energy to worthwhile pursuits. He wants to work and pay back the money he owes. ███████████████████████████████ And he is lucky to have extremely supportive parents and extended family who have witnessed his downfall and who are committed to helping him pick himself up again.

For the reasons described below, a sentence of probation with home detention and a community service requirement is wholly sufficient to achieve the statutory goals of sentencing. See 18 U.S.C. § 3553(a).

**Personal Background**

Jeremy and his twin sister, Lucy, were born in September 1996. They were raised in the relatively small community of Bristol, Rhode Island, where their parents, Gerard and Emily, worked as educators. Gerard is a "beloved teacher" at the high school his children attended and Emily "works to help parents learn the best ways to raise their children." Exhibit C, Letter from Lucy Spence. In their middle-class home, Gerard and Emily emphasized the importance of education and community service. Jeremy and Lucy were raised to exemplify those values. "Jeremy's parents modeled right and wrong. They maintained worthy and clear expectations and consequences. Jeremy flourished within these bounds and by the example of his parents. He always comported himself as a respectful, responsible young man." Exhibit H, Letter from Moclairs.

From kindergarten through high school, Jeremy was a model student and community member. "Jeremy excelled academically. He played sports (soccer and wrestling), was well

liked and had a small but loyal group of friends." Exhibit F, Letter from Kerri Sloat. He graduated from Mount Hope High School as the tenth-highest-ranked student in his graduating class. See Exhibit L, High School Certificates. In comparison to his more social and extroverted twin, Jeremy "is a far more reticent person." Exhibit B, Letter from Parents. He has always been "competitive and independent," and interested in pursuing "intellectual challenge[s]." Id.

Jeremy left an indelible impression on the adults at his high school. His high school counselor writes: "While Jeremy attended high school, he conducted himself with the highest level of integrity and kindness. He was a respectful, thoughtful, compliant, and focused young man who excelled academically, athletically, and interpersonally." Exhibit I, Letter from Counselor Atkinson. She specifically remembers his participation in the National Honor Society and as a volunteer with the Special Olympics. See id. Another teacher writes:

> In his junior year, 2012 to 2013, Jeremy took my very challenging Advanced Placement (AP) Macroeconomics class. In that class, students must largely self-educate. By that I mean they must very carefully read the assigned chapters for understanding of rather complex concepts. I did a minimum of teaching and was more of a facilitator than an educator. Despite this challenge, Jeremy seemed to thrive. He was the only junior in a class of seniors, and he earned the only A (93) in the class. Furthermore, Jeremy earned a coveted "5" on his AP Exam. A "5" is the highest possible score on the AP Exam, and he was the only student I have ever had who achieved this level of proficiency.
> Exhibit K, Letter from Mr. Calouro.

Jeremy has always been a curious, passionate, and sometimes, obsessive, person. His sister explains that Jeremy "would fully devote himself to things that he found important to him like wrestling, schoolwork, website development, philosophy and other interests of his…When he was interested in something he became an expert on it and could, and often would, talk about it for hours." Exhibit C, Letter from Lucy Spence. His parents write: "He has always sought to be unique in his approach, in his thinking, and in his life choices. We have applauded this in him." Exhibit B, Letter from Parents.

Jeremy has worked since he was 15 years old. If he wanted money in his pocket, he had to earn it. In the summers, during high school, he worked as bus boy at a local restaurant in Bristol, the Lobster Pot, for $4 per hour plus tips.

Bristol was a peaceful, low-crime area where Jeremy was privileged to be raised. However, one of the few and most disturbing crimes to ever pierce the security of that community befell the Spence family. In 1999, Gerard's mother (Jeremy's grandmother), Angela, was raped and murdered inside of her home. This shocking crime had a lasting impact on their family – increasing Gerard's alcohol use and shattering their sense of security and privilege. A friend writes: "I closely saw how deeply this tragedy affected [Gerard], and I am sure there were many times when deep sadness pervaded the Spence household. I saw what a monumental hole Gerard had to dig himself out of in order to simply perform daily activities." Exhibit K, Letter from Mr. Calouro.

When high school was ending, Jeremy was determined to expand his world beyond his hometown. He writes: "I wanted to do something different. I wanted to be around people with bigger dreams and ambitions, so I chose to make as significant a change as possible and decided to come to New York City." Exhibit A, Letter from Jeremy Spence. "When Jeremy chose NYU as his college, we were all very excited for him. He went off to New York City, having grown up in a small town. He had never gone anywhere without his family or lived on his own. He made friends and seemed to be very happy." Exhibit E, Letter from Smalls. In New York, he started a relationship with his girlfriend, Katherine, which continues through today. At NYU, for approximately 6 semesters, he studied philosophy and physics, "[n]ot because of any particular career path I had in mind, but because I was genuinely interested in what I was learning." Exhibit A, Letter from Jeremy Spence.

For the first two years, he had a work-study job on campus, and then in 2016, he got his first professional internship, which turned into a job. He worked as a marketing lead for a startup company, an app design and development company in Brooklyn. Jeremy liked the smart, creative, and entrepreneurial people he met there. He liked having a job and he spent more and more time at work than at school. His parents write: "He was proud of his appointment and so were we." Exhibit B, Letter from Parents. Jeremy also became infatuated with technology. He taught himself coding, HTML, CSS, JavaScript, and web design.

Jeremy's attention was focused on his new endeavors and he started to ignore his responsibilities at college. He got poor grades for the first time in his life. By 2018, he dropped out of NYU entirely.

**The Online World of Cryptocurrency and Offense Conduct**

One such endeavor was the online world of cryptocurrency trading. Cryptocurrency is a relatively new idea: it is electronic currency that "is not issued by any governmental entity and functions only be agreement within the community of users of that particular currency." PSR ¶ 9. Jeremy describes that he always "jump[ed] headfirst into new challenges, always figuring them out as I went." Exhibit A, Letter from Jeremy Spence. "I had no knowledge of finance at the time, but I figured…I would learn as I went." Id. It was a brand new field for Jeremy and it uniquely utilized his tech skills, his intellect, and his comfort working behind a computer screen. A life-long introvert, he felt empowered by the ability to conduct business online, rather than face-to-face. He ultimately left school and work and focused on cryptocurrency full time.

Jeremy initially invested his own money in cryptocurrency. He created a screenname ("Coin Signals") and started posting information on Twitter and through other social media applications and websites, to recount his own trading and offering tips to others. "These strategies were successful and productive and shortly thereafter Jeremy had a large following of individuals who subscribed to his social media platform – many of whom solicited investment advice from him." Exhibit D, Letter from Uncle Justin Spence.

For some time, people on the internet followed him and copied his trades. Like many of his prior passions, Jeremy pursued cryptocurrency with real focus and drive. He read everything

he could about the markets and he enjoyed immersing himself in that world. He wanted desperately to be good at it and he liked the attention he received when people thought he was doing well. His uncle writes: "during this time I saw a level of confidence and personal pride in Jeremy that I'd never seen before. Still innately reserved he exuded a new found comfort in his own skin that was nice to see. And I don't believe it was the money, either. In my view it was a sense of pride that people were coming to him and asking him what he thought they should do to share in the growing new mania that was (is) cryptocurrency." Id.

Soon, Jeremy offered to invest other people's money for them. This, alone, was a bad choice. His uncle writes: "he made poor decisions to invest on the behalf of others using his self-taught 'expertise.'" Id. Jeremy feels the same way: "I know that I acted very recklessly getting myself so involved with other people's money with so little experience." Exhibit A, Letter from Jeremy Spence. Jeremy started private online chat rooms and funds and before long, strangers were sending him large sums of money – and fast. A year earlier, he never could have even imagined that he would be trading with millions of dollars (indeed, he had never had more than $20K in his bank account in his life), and yet, it was happening. Jeremy writes: "I got into a situation way over my head and made many mistakes." Id.

21-year-old Jeremy did not at all appreciate the responsibility that came along with his newly-acquired power. He invested the money he received in online crypto exchanges. The largest fund was on the BitMEX platform.[1] In this world, Jeremy posted information to the investors using chat rooms and a "bot" – an automated program that announced information based on data that Jeremy supplied it. He entered data into the bot that would attract more investors. Some of the data Jeremy entered was misleading – he would combine balances from different accounts, or use estimated gains – and some was downright false. He acted far more knowledgeable and profitable than he actually was. Based on this data, investors – which came to number 170, from all over the world – sent him inordinate amounts of money. Albeit stupid and immature, it never fully occurred to Jeremy that he had serious obligations to these anonymous people or that doing so was regulated by federal laws. He had no idea how much damage he could do to real investors – real people who suffered real losses – via an online and unregulated platform. Jeremy explains: "I did not set out to harm anyone, but I know that I did." Exhibit A, Letter from Jeremy Spence. For not thinking that through, Jeremy will pay dearly.

Anonymity and informality were hallmarks of that world – and, as a result, serious business was conducted in a wholly unserious and unprofessional way. For example, almost all of the communications Jeremy had with investors was screenname to screenname; people

---

[1] The BitMEX platform was, itself, breaking the law. The founders and executives of BitMEX were recently prosecuted in this District. See SDNY USAO Press Release, Feb. 24, 2022, available at https://www.justice.gov/usao-sdny/pr/founders-cryptocurrency-exchange-plead-guilty-bank-secrecy-act-violations. United States Attorney Damian Williams explained that "BitMEX…operate[d] as a platform in the shadows of the financial markets." Id. BitMEX was not permitted to serve U.S. customers, but the executives flagrantly flouted that rule. Id. For their misconduct, the founders recently pled guilty before the Honorable John G. Koeltl and are pending sentencing. Id.

communicated with "emoticons" instead of words; they used abbreviations and wrote in half-sentences; profanity was prolific.  For example:



USAO_6111, USAO_6115.

For example, Jeremy posted the following public statements for his investors (and anyone else) to see, using "Jk" as an abbreviation for "just kidding":



USAO_24596.

Jeremy often commented on the substance of market performance with one non-substantive word (e.g. "hmm") and also about the shape of the lines that appeared on the graph (e.g. "another squiggly line") – i.e. not the hallmarks of serious investment advising:



USAO_4215-20.

This new world was wholly incompatible with traditional financial practices. For example, Jeremy used a 1-page "contract" to sign people up. On one occasion, an investor returned it to him with his information written in by pen, including his address where the form said "address"; that decision was mocked as woefully out of date:



USAO_6926.

By January 2018, one of Jeremy's investors – who clearly had experience in more traditional financial dealings – sent a chat to another, citing the obvious problems that would befall Jeremy in the future:



Jeremy's decision-making went from bad to worse. The crypto markets were extremely volatile. When his investments had a bad day, for example, Jeremy panicked. "When I first started losing money I began to have significant anxiety. I hated the idea of disappointing all of these people." Exhibit A, Letter from Jeremy Spence. And rather than maturely explaining that the risks were real and that people had incurred losses, Jeremy lied. "I did not know how to get out of the situation or handle it correctly." Id. And he compounded those lies with more lies. "In my efforts to try and fix things I just ended up making things worse and hurting more people, which I severely regret." Id.

These poor decisions caught up with Jeremy in less than one year. By September 2018, more investors were demanding their money back than he had to give. To comply with those requests, Jeremy needed money – and that's when he started paying off old investors with new investors' money. As his operation crumbled at the end of 2018, Jeremy made increasingly poor choices. Jeremy was simply not ready to face the reality of the situation. In an effort to stall the investors, he lied to them. He made up stories and doctored evidence that the funds were still solvent. The ruse was a failure. On December 19, 2018, Jeremy finally came clean about some – but not all – of his misconduct, posting: "I've spent the past two months trying to hide my drawdowns with lies and deceit. I continually tried to stall for the positions I was in to be in a better state, but that never came…I…continued to make things worse by making more bad trading decisions." See Criminal Complaint, ¶ 19.a.

Jeremy was not motivated by greed or monetary self-enrichment. Instead, he made immature decisions out of a place of embarrassment and naïveté. At no time did Jeremy steal or secrete the money away. "I never wanted to hurt anyone or take anything for myself. All I wanted to do was get back everyone's money and return it to them." Exhibit A, Letter from Jeremy Spence. He put it into the crypto markets or repaid other investors and hoped for the

best.  Indeed, the government agrees that Jeremy paid back more than 2 million dollars to investors who wanted to collect and/or withdrew their money, of the 5 million dollars that was invested with him overall, leaving a net loss of approximately 3 million.  In this way, Jeremy is distinct from many other fraud defendants; in other cases, the government regularly points to the extreme, lavish lifestyles they carry on – but there are no such allegations here.  Still, there is no question that real people lost real money.

Acceptance of Responsibility

"I am truly remorseful," Jeremy writes.  See Exhibit A, Letter from Jeremy Spence.  "I am truly sorry for my actions and the negative effects that they have had on others."  Id.  He never set out to hurt anyone and he is embarrassed and ashamed that he did.  "Every day of the past few years I have been mortified by what I had done and the hurt that I caused others."  Id.  He is committed to never make such bad decisions again.  See id.  His parents write that Jeremy has been "humbled by his mistakes and would jump at the chance to turn back time and undo the problems he has caused."  Exhibit B, Letter from Parents.

In recognition of his criminal wrongdoing, Jeremy pled guilty to commodities fraud, for violating 7 U.S.C. §§ 9(1) and 13(a)(5).  At the time of his plea, he made clear that he knew what he was doing was wrong and that he made a lot of mistakes.  He also apologized for his actions.

His uncle writes: "I am heartened that he has entered a guilty plea and is taking responsibility for his actions. He knows that he did great wrongs and is prepared to face the consequences of his behavior."  Exhibit D, Letter from Uncle Justin Spence.  They recognize that Jeremy's acceptance of responsibility is the first step towards atoning for his crime: "I have been ready to accept the consequences of my actions so I can eventually try to move on and make better decisions in my future."  Exhibit A, Letter from Jeremy Spence.

**Aftermath of His Offense Conduct**

The investors first pursued Jeremy in a civil context.  In December 2018, they brought the first case against him, see 18 Cv. 12218 (GBD),[2] and a second case was brought in May 2019, see 19 Cv. 4005 (GBD).  When the civil suits did not get the money refunded right away,[3] the investors called the FBI:

---

[2] Initially, Jeremy's parents were also named as defendants in this civil suit, but were eventually dismissed from it.

[3] Eventually, the civil cases ended with Orders for Jeremy to pay back the investors: in October 2020, a default judgment was entered on the second case (and was referred for an inquest on damages).  19 Cv. 4005 (GBD), Dkt. No. 24.  In December 2020, in the first case, Judge Daniels granted the plaintiffs' motion for summary judgment and Jeremy, who was not represented by criminal or civil counsel at the time, was ordered to pay more than 3 million dollars in damages and interest.  18 Cv. 12218, Dkt. Nos. 151, 152.



See USAO_6786-93.

Jeremy was arrested by federal authorities on January 26, 2021. Jeremy writes that he was "almost relie[ved]" when the agents came for him. See Exhibit A, Letter from Jeremy Spence. "I had felt so guilty about my actions and I knew there should and would be repercussions." Id.

That same day, the Commodity and Futures Trading Commission (CFTC) also filed an action against Jeremy. See 21 Cv. 699 (JGK), Dkt. No. 1. After Jeremy was indicted, undersigned counsel sought a stay of the CFTC matter that was granted by Judge Koeltl. Id. at Dkt. No. 23 (May 26, 2021). Counsel has also engaged in settlement negotiations with the CFTC, which will hopefully be resolved following sentencing in this case. Such a resolution would finalize all of the litigation regarding Jeremy's offense conduct.

Everything around Jeremy crumbled. By 2020, Jeremy ended up back home, in his parents' house in Bristol, Rhode Island, broke and unemployed. And that is where he remains.

This case has had a very large impact on Jeremy. He was a social individual in New York City with a girlfriend, friends, and many interests. Now he lives at home with my parents in the small town that he grew up in. It's easy to see the stress that he feels on his face every day even though he is trying to be brave for the sake of those around him. Exhibit C, Letter from Lucy Spence.

Jeremy's misconduct has taken a toll on his whole family: "I know that they are very worried and stressed about the situation. I know that I have hurt them financially and emotionally, and I feel ashamed of that." Exhibit A, Letter from Jeremy Spence. He is

determined to right his wrongs. See id. His aunt writes: "My sister and her husband [Jeremy's parents] have been torn apart by this and my almost 90 year old mother [Jeremy's grandmother] is extremely worried and heartbroken. My husband and I are heartbroken and anxious knowing what could happen to this young man who we love." Exhibit E, Letter from Smalls.

Jeremy is currently financially supported by his parents. He sometimes mows lawns or does other odd jobs in his neighborhood. In recent months, he has completed some freelance online graphic and web design jobs for small fees. He still has a lifetime of growing up and rebuilding to do.

Jeremy has used this time at home to re-focus on his family and family-oriented projects. For example, after his grandfather's death at the beginning of the pandemic, Jeremy finalized the autobiography his grandfather had been working on for years and turned it into a real book for each member of the family to have. See Exhibit C, Letter from Lucy Spence. "Watching him through these past years of waiting, living in his parents' home in limbo, we have seen him work hard at being positive. He is helpful around the home and often helps his grandmother. He helps her with outdoor projects, taking her on errands, and visiting and playing cards with her." Exhibit E, Letter from Smalls.

**Guidelines Calculation**

The parties and Probation arrived at the same guidelines calculations, using Section 2B1.1. The offense level is principally driven by the loss amount: beginning with a base level of 6, there is a 2-level increase for the number of victims, a 4-level increase for being a commodities trading advisor or a commodity pool operator, and a 16-level increase due to the loss amount. After subtracting 3 points for timely acceptance of responsibility, the adjusted offense level is 25.

Jeremy has a criminal history score of zero, which places him in criminal history category I. The resulting applicable range is 57-71 months.

The Guidelines Should Not be Afforded Great Deference in this Case

The Second Circuit has specifically invited district judges to consider non-guideline sentences when utilizing Section 2B1.1 of the Guidelines: "Where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-guidelines sentence." United States v. Algahaim, 842 F.3d 796, 800 (2d Cir. 2016). Indeed, in Section 2B1.1, "the Commission valued fraud…at level six, which translates in criminal history category I to a sentence as low as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." Id. The Circuit wrote that "[t]his approach" is "unknown to other sentencing systems," and therefore, "its unusualness is a circumstance that a sentencing court is entitled to consider. Id. (citing Kimbrough v. United States, 552 U.S. 85, 101 (2007)).

Moreover, courts in this Circuit have strongly criticized the Guidelines' use of loss as the main measure of the seriousness of economic crimes. The "widespread perception that the loss guideline is broken." United States v. Corsey, 723 F.3d 366, 378 (2d Cir. 2013) (Underhill, J. concurring). "For the small class of defendants convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense. Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges." Id. at 380 (internal quotations and alterations omitted); see also United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) (condemning the "excessive weight on [the fraud loss] factor" and noting that loss is a "relatively weak indicator of the moral seriousness of the offense or the need for deterrence"); United States v. Black, 16 Cr. 370 (CM) (S.D.N.Y. Oct. 24, 2019), Dkt. No. 457, Sent. Tr. 56:5-16 (noting the "utterly ridiculous fraud guidelines chart" is "heavily weighted toward increasing the number of enhancement points" as the loss amount increases – "a fact that has been criticized on more than one occasion by this and other courts," and criticizing in particular a 16-point enhancement driven by a loss amount of $2.6 million).

The Guidelines' loss enhancement was developed "without the benefit of empirical study of actual fraud sentences by the Sentencing Commission." Corsey, 723 F.3d at 380. Because the Commission failed to rely on empirical data or national experience in promulgating and amending Section 2B1.1, this Court is free to conclude that the application of this guideline "yields a sentence greater than necessary to achieve § 3553(a)'s purposes." Kimbrough, 552 U.S. at 109-10.

In light of the widespread criticism that the Guidelines' treatment of economic crimes has received from courts, practitioners, academics, and experts, an American Bar Association task force (which included among its members Judges Lynch and Rakoff, and former Judge Gleeson) proposed amendments that would focus less on "loss" and more on "culpability."[4] The task force's report drew particular attention to sentences for first-time, non-violent offenders and recommended an approach more faithful with the Sentencing Commission's enabling legislation, whereby "[i]f the defendant has zero criminal history points under Chapter 4 and the offense was not 'otherwise serious' within the meaning of 28 U.S.C. § 994(j), the offense level shall be no greater than 10 and a sentence other than imprisonment is generally appropriate."[5] See also United States v. Leitch, 11 Cr. 609 (JG), 2013 WL 753445, at *1 (E.D.N.Y. Feb. 28, 2013) (noting that the Commission was "was supposed to ensure 'the general appropriateness' of probationary sentences for first-time offenders unless they commit 'crime[s] of violence or . . . otherwise serious offense[s].' Instead, it unilaterally declared in 1987 that every theft, tax evasion, antitrust, insider trading, fraud, and embezzlement case is 'otherwise serious,' and thus

---

[4] Am. Bar Ass'n, Criminal Justice Section, "A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes" (Nov. 10, 2014), available at https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.

[5] Id.

no more eligible for a sentence of probation, even when committed by a first-time offender, than would a crime of violence").

Given that the Guidelines' range in this case is driven largely by the loss-amount enhancement (indeed, without it, the range would be 6-12 months), the Court should deem it greater than necessary and the Guidelines should be afforded little deference.

**Appropriate Sentence**

In selecting a sentence, this Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)." United States v. Douglas, 713 F.3d 694, 700 (2d Cir. 2013). That provision "directs sentencing courts to 'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)." Id. "Those factors are, broadly speaking, proportionality, deterrence, incapacitation, and rehabilitation." Id. The guidelines, of course, are advisory and this Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007). In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." Pepper v. United States, 562 U.S. 476, 487-88 (2011) (citations omitted).

<u>Jeremy has No Criminal History, Which Drastically Reduces his Risk of Recidivism</u>

This case marks Jeremy's first-ever contact with the criminal justice system. Statistically, this means that Jeremy – with zero Criminal History points – is in a group that "present a significantly lower risk of recidivism than any other group of federal offenders." See U.S. Sent'g Comm'n, The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders, at 6–7 (March 2017).[6] In fact, the Sentencing Commission found that "[o]ffenders with zero criminal history points" have a "lower rearrest rate" than even offenders with one criminal history point. Id. As the Commission's data confirms, offenders with zero Criminal History points are in a wholly unique category for sentencing purposes – one which is least in need of significant incarceration to prevent rearrest or reconviction:

---

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf.



Id. (emphasis added).

### Jeremy's Adolescent Brain was Still Developing at the Time he Committed this Crime

Jeremy's offense conduct was rife with impulsive and poor decision-making. That inability to think through long-term consequences is a biological and behavioral hallmark of the age Jeremy was at the time. As such, he is also biologically and behaviorally likely to grow out of that phase in his life.

"It is well established that various morphological and physiological changes occur in the human brain during adolescence" and "the brain undergoes a 'rewiring' process that is not complete until approximately 25 years of age." [7] This rewiring primarily takes place in the prefrontal cortex (PFC) – the part of the brain that contributes to the regulation of emotion in decision-making. Id. Until the age of 25, the PFC "remains under construction." Id. "The development of the prefrontal cortex is very important for complex behavioral performance, as this region of the brain helps accomplish executive brain functions." Specifically, the PFC is responsible for foresight, "weighing possible consequences of behavior," "modulation of intense emotions," "impulse control," "forming strategies and planning," and "organizing thoughts and problem solving." Id.

Thus, scholars have determined that "[b]ecause adolescents rely heavily on the emotional regions of their brains, it can be challenging to make what adults consider logical and appropriate decisions." Id. Jeremy committed this crime from the time he was 21 years and 1 month old through turning 22 – precisely during the time period in which his pre-frontal cortex was still

---

[7] Mariam Arain et al., "Maturation of the Adolescent Brain," Neuropsychiatric Disease and Treatment, 9:449-461, Apr. 3, 2013, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/.

under development.  His high school teacher points out: "His transgression was committed before the age when young men's brains fully understand the consequences of their contemplated actions."  Exhibit K, Letter from Mr. Calouro.  In fiscal year 2020, only 7.9% of fraud defendants were between the ages of 21 and 25.[8]  The mean age of a fraud defendant was twice Jeremy's age: 42 years old.[9]  In other words, most fraud defendants – unlike Jeremy – committed their crimes long after their brains were finished developing and when they had all of the long-term decision-making capacity they would ever have.

Today, Jeremy's cognitive development is at a different stage than when he committed the instant offense.  He turned 25 last September and is entering a different phase of his life, practically and biologically.

<u>No Jail Time is Necessary to Deter Jeremy – or Anyone Else</u>

"I can assure you [that Jeremy] is already humbled, embarrassed, and ashamed…[I]n terms of rehabilitation he's learned very well a valuable and already very costly life lesson."  Exhibit D, Letter from Uncle Justin Spence.

While recommending a downward variance (to 36 months), the Probation Department notes that jail time is not required for specific deterrence in this case.  Probation writes: "The undersigned does not believe the defendant will recidivate as it appears the offense was due to the defendant's age and lack of maturity, and not understanding the full consequences of his actions.  As such, the undersigned is hopeful that the defendant has essentially learned his lesson."  PSR recommendation.

Instead, Probation cites to general deterrence as justification for a jail sentence.  While jail is one way to achieve general deterrence, it is not the only way.  There is widespread agreement that the certainty of apprehension is a much more important factor for deterrence than the severity of punishment.[10]  Three National Academy of Sciences panels have concluded, and empirical data has demonstrated, that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[11]  Research has also shown that there is no

---

[8] U.S. Sent. Comm. "2020 Annual Report and Sourcebook," <u>available at</u> https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf.

[9] <u>Id.</u>

[10] <u>See, e.g.</u>, V. Wright, Sent'g Project, Deterrence in Criminal Justice: Evaluating Certainty vs. Severity of Punishment, at 4-5 (2010), <u>available at</u> https://www.sentencingproject.org/wpcontent/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf (summarizing research); Z. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime, 8 CARDOZO J. CONFLICT RESOL. 421, 447-48 (2007).

[11] M. Tonry, Purposes and Functions of Sentencing, 34 CRIME & JUST. 1, 28 (2006).

difference in the deterrent effect between a non-custodial sentence and imprisonment for "white-collar" offenses.[12]

Here, Jeremy's apprehension and criminal prosecution was covered by the press and any google-search of his name reports his arrest and guilty plea.[13] Most importantly, the story of Jeremy's behavior – and downfall – was widely covered by the press in the online cryptocurrency world.[14] By pleading guilty to a felony criminal charge, Jeremy has already served as a cautionary tale for those who may be engaged in or contemplating similar activity. A non-incarceratory sentence will not lessen the general impression that his crime had lasting and permanent consequences. Also deterring is a life-long felony record, his restitution obligation, the onerousness of probation, and terms of home detention and community service.

<u>A Non-Incarceratory Sentence will Prevent Undue Disparities</u>

Jeremy was convicted of violating a rarely-used statute in this District. In another case with an identical crime of conviction, also for cryptocurrency-based commodities fraud, <u>United States v. Thompson</u>, 19 Cr. 698 (ER), Dkt. No. 51 (Feb. 16, 2021), the defendant was sentenced to time served (no jail time) and 3 years of supervised release.

In fact, many people who have engaged in similar – or more serious – conduct regarding cryptocurrency have been the subject of regulatory enforcement actions, not criminal cases. <u>See, e.g.</u>, <u>CFTC v. Dean et al.</u>, 18 Cv. 345 (SJF) (E.D.N.Y.) (CFTC alleged that for approximately nine months, defendants engaged in a fraudulent scheme, through which they solicited Bitcoin from at least 127 members of the public using websites, YouTube videos, and Facebook posts, in which the defendants claimed that customers' funds would be invested in commodity options, but defendants never engaged in trading on behalf of their customers, and defendants' purported trading profits were fictitious; as a result, more than 120 customers suffered losses); <u>CFTC v. Gelfman Blueprint, Inc. and Nicholas Gelfman</u>, 17 Cv. 7181 (PKC) (S.D.N.Y.) (CFTC alleged

---

[12] D. Weisburd et al., Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes, 33 CRIMINOLOGY 587 (1995); <u>see also</u> Gabbay, <u>supra</u>, at 448–49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders."); F. Cullen et al., Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science, 91 PRISON J. SUPP. 48S, 50S-51S (2011).

[13] <u>See, e.g.</u>, government press releases, <u>available at</u> https://www.justice.gov/usao-sdny/pr/cryptocurrency-trader-pleads-guilty; https://www.justice.gov/usao-sdny/pr/cryptocurrency-trader-charged-manhattan-federal-court-fraudulent-scheme-involving-over; https://www.cftc.gov/PressRoom/PressReleases/8356-21.

[14] <u>See, e.g.</u>, cryptocurrency-related websites, <u>available at</u> https://fullycrypto.com/jeremy-spence-pleads-guilty-to-commodities-fraud; https://www.leaprate.com/financial-services/fraud/coin-signals-jeremy-spence-to-pay-44m-penalties-at-cftc-request/; https://www.ai-cio.com/news/cryptocurrency-trader-coin-signals-pleads-guilty-to-commodities-fraud/; https://coingeek.com/coin-signals-man-pleads-guilty-to-5m-btc-ponzi-scheme-faces-10-years-in-prison/.

that, for approximately two years, defendants operated a Bitcoin Ponzi scheme in which they fraudulently solicited investments from more than 80 customers; made and provided false performance reports to investors; and, in order to conceal the scheme's trading losses and misappropriation, staged a fake computer "hack" that supposedly caused the loss of nearly all customer funds); <u>CFTC v. Venture Capital Investments Ltd. and Breonna S. Clark</u>, 20 Cv. 382 (DDD) (D. Colo.) (CFTC alleged that defendants fraudulently solicited more than 72 clients to invest in commodity pools that purportedly traded in digital assets, including Bitcoin, only to misappropriate the money; CFTC alleged that the defendants targeted clients through social media email, webinars, and meetings at churches and individual homes, and used their money to acquire, among other things, a luxury automobile, and to make Ponzi-type payments to others to perpetuate the scheme); <u>CFTC v. Garcia et al.</u>, 20 Cv. 3185 (SL) (S.D. Tex.) (CFTC alleged that, for more than one year, the defendants operated a fraudulent scheme involving the solicitation of customer funds to speculate in price movements of Bitcoin based on false statements of trading experience and capabilities; falsely represented that customer earnings would increase based on the amount of their deposits and that defendants would award bonuses to customers who referred other participants; and caused misleading trading statements to be posted online, which led customers to believe they were earning significant amounts of money from defendants' trading of Bitcoin on their behalf); <u>CFTC v. Hunt et al.</u>, 18 Cv. 807 (RCO) (N.D. Tex.) (CFTC alleged that, for more than one year, the defendants used Facebook and email to fraudulently solicit Bitcoin from members of the public; falsely claimed that they would use customer funds to invest for customers; misrepresented their experience and track record as traders and portfolio managers; falsely told customers that they could not withdraw their purported investment profits without first paying a tax to the CFTC; provided fake account statements; impersonated a CFTC investigator; sent forged documents purportedly authored by the CFTC's General Counsel; and misappropriated customer funds). That none of those people went to jail – or incurred any kind of criminal conviction or court supervision – is relevant to the Court's determination of a just outcome in this case.

<u>Jeremy has Already Demonstrated that he can be Successful on Court-Ordered Supervision</u>

Jeremy has been on Pretrial Services supervision for more than 15 months. During that time, he has been fully compliant with the terms of his release. "Jeremy has steadfastly adhered to the Court's orders." Exhibit D, Letter from Uncle Justin Spence. This track record of compliance can give the Court confidence about his future compliance with supervision as part of his sentence.

[redacted]

---

[15] [redacted]



**Plans for the Future**

　　　Jeremy wants desperately to get his life back on track. He is eager to complete the last two semesters of his college education and to work to support himself. See Exhibit A, Letter from Jeremy Spence. He has marketable skills and experience and intelligence that should make him employable. He wants to re-focus on science, which was his original passion in high school. In doing so, he is determined to "be far away from anything finance-related." Id.

　　　He has potential to be a productive and contributing member of society and his community. His family friends write: "Considering the evidence of Jeremy's history and upbringing, we predict that he will turn his life to a meaningful pursuit and engage his admirable

---

[16] See Office of the Inspector General, U.S. Department of Justice, "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," pp. i-ii, March 2016, available at https://oig.justice.gov/reports/2016/e1602.pdf.

intellect in something good…We know that Jeremy can rise to the challenges that he faces." Exhibit H, Letter from Moclairs.  Another says:  "I have no doubt that Jeremy will be a young man that contributes to society in a positive manner. He is ready to reform and move forward from mistakes."  Exhibit F, Letter from Kerri Sloat.

### The Terms of An Non-Incarceratory Sentence Can Also Achieve the Statutory Goals of Sentencing

#### Home Detention and Community Service

A significant term of home detention will adequately punish and deter Jeremy.  Requiring him to wear an ankle monitor and abide by the strictures of home detention would be a far more onerous infringement on his liberty than he has ever experienced.  Indeed, no such condition has been required of him while out on bail.

In addition, imposing a community service obligation as part of Jeremy's sentence would serve as an important reminder – during every minute of his service – of the lesson we want all first-time offenders to learn from the criminal justice system: do not ever commit a crime again. Moreover, such a requirement would demand that Jeremy begin to fill his days with pro-social, proactive good deeds in his hometown.  This type of sentence "would allow Jeremy to prove his willingness to reform and illustrate his desires to improve his character and reverse decisions that led to this situation."  Exhibit G, Letter from Denis Leonti.

#### Mental Health Counseling



---

[17] Concurrent with Probation's recommendation, we also consent to any drug-testing condition, but expect that further treatment will not be recommended.  Jeremy ceased all marijuana use at the time his federal bail conditions were imposed, and has remained drug-free for more than a year.  His college-experimentation with other drugs is now solidly behind him.

### Employment and Various Financial Conditions

Requiring Jeremy to work is the best way to achieve what the victims want most: to receive restitution. As the plea agreement makes clear, Jeremy has readily accepted his restitution obligation. Moreover, the Probation Department has tools that are tailored for the supervision of a person who committed financial crimes: it can set rules regarding opening lines of credit and bank accounts, require financial disclosures, and other mechanisms to ensure that Jeremy's financial activities are compliant with the law and his restitution obligations.

### Jeremy has the Type of Family Support that will Help Him Succeed

Jeremy's family will be with him every step of the way. "[H]e is surrounded by strong loving people who will support him in his future plans." Exhibit E, Letter from Smalls. His sister writes: "With myself as a mentor and strong familial support, I know Jeremy could work his way towards a great career in a field that could greatly help people." Exhibit C, Letter from Lucy Spence. "We have witnessed Emily and Gerard offer endless support and unconditional love to their son throughout this process." Exhibit H, Letter from Moclairs. His uncle writes: "You have my commitment that I will devote my time and love moving forward to help him make something big of his life as he makes restitution and beyond." Exhibit D, Letter from Uncle Justin Spence. The Spence family stands ready to help make sure that the mistakes of Jeremy's young adulthood do not ever repeat themselves. They are confident – and the Court can be too – that he can grow and mature into a productive citizen.

## Conclusion

For all of these reasons, a sentence of supervision with home detention and a community service requirement is sufficient to achieve the statutory goals of sentencing.

Respectfully submitted,

/s/
Sylvie Levine
Neil P. Kelly
Counsel for Jeremy Spence