```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA        :

          -v.-                  :     21 Cr. 116 (LAK)

JEREMY SPENCE,                  :
     a/k/a "Coin Signals,"
                                :

          Defendant.            :
- - - - - - - - - - - - - - - x
```

**THE GOVERNMENT'S SENTENCING MEMORANDUM**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

Christine I. Magdo
Assistant United States Attorney
– Of Counsel –

## Table of Contents

**PRELIMINARY STATEMENT** ..................................... 1

**BACKGROUND** ................................................ 1

**I. The Offense Conduct** ................................... 1

  A. Spence Created the "Coin Signals" Online Persona ..... 2

  B. Spence Created Cryptocurrency Investment Pools, or
    "Funds" ............................................... 3

  C. Investors Received False Account Balances Through a
    "Bot" ................................................. 4

  D. Spence Defrauded an Individual Investor of Over
    $800,000 .............................................. 6

**II. The Plea Agreement, Guidelines Calculation and
    Restitution** ......................................... 11

**ARGUMENT** ................................................. 12

**I. A Guidelines Sentence is Consistent with the Goals of
    Sentencing, the Characteristics of this Defendant, and
    the Nature of this Offense** ........................... 12

  A. The Defendant Wrought Financial Devastation on Numerous
    Victims ............................................... 12

  B. The Defendant Inflicted Irreparable Psychological
    Damage ................................................ 14

  C. The Defendant Defrauded His Friends and Ignored the
    Warnings of Those Who Tried to Help Him ............... 16

  D. The Need to Avoid Unwarranted Sentence Disparities
    Among Similarly Situated Defendants ................... 18

  E. A Substantial Sentence is Needed to Afford Just
    Punishment and Adequate Deterrence ................... 19

**II. The Mitigating Factors Presented by Spence Do Not
    Justify a Below-Guidelines Sentence** ................. 20

**CONCLUSION** .............................................. 23

**<u>Victim Impact Statements*</u>**

Exhibit 1:      Jason Baptiste

Exhibit 2:      Aivaras Cepelis

Exhibit 3:      Daniel Hilderman

Exhibit 4:      Manfred Lagemann

Exhibit 5:      Jeremy Lee

Exhibit 6:      Maurice Martinez

Exhibit 7:      Jose Quintas

Exhibit 8:      Vitaliy Rudenko

Exhibit 9:      Karel Segers

Exhibit 10:     Daniel Truque

Exhibit 11:     Andre Viana

Exhibit 12:     José Duarte Vieira

Exhibit 13:     Gregor Wallner

Exhibit 14:     Naor Yehudaey

Exhibit 15:     Craig Young

* Victim statements have been redacted in accordance with
  Fed.R.Crim.P 49.1 and 18 U.S.C. § 3771 to remove home
  addresses, email addresses, and names of minors.

**PRELIMINARY STATEMENT**

The Government respectfully submits this memorandum in connection with the sentencing of defendant Jeremy Spence, a/k/a "Coin Signals" ("Spence" or the "defendant"), which is scheduled for May 11, 2022 at 3:00 p.m., and in response to the defendant's sentencing letter dated April 29, 2022 ("Def. Ltr."). The parties and the United States Probation Office agree that the Guidelines range applicable to the defendant's conduct is 57 to 71 months' imprisonment. (Presentence Report dated February 16, 2022 ("PSR") ¶ 76). The defendant requests a downward variance, resulting in a sentence of probation with home confinement and community service, based largely on his age, his health, his status a first-time offender, and the reputational harm he has already suffered. For the reasons set forth below, the Government respectfully requests that the Court reject the defendant's request for a downward variance and impose a sentence within the applicable Guidelines range of 57 to 71 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing in this case.

**BACKGROUND**

## I.   The Offense Conduct

For approximately a year and a half, from November 2017 through April 2019, Spence engaged in a Ponzi-like scheme to defraud more than 170 individuals of over $5.37 million by falsely

holding himself out as a successful cryptocurrency trader. Spence told potential investors that his crypto trading had been extremely profitable when, in truth and in fact, Spence's trading had been consistently unprofitable. After Spence convinced his victims to invest with him, he generated fictitious account balances, which he made available to investors online. Instead of accurately reporting the trading losses Spence was incurring, the account balances falsely indicated to investors that they were making money by investing with Spence. In truth and in fact, Spence used the funds his victims had entrusted to him to engage in risky trading with disastrous results. To hide his trading losses and perpetuate his scheme, Spence used approximately $2 million in new investor funds to pay back earlier investors in a Ponzi-like fashion. (PSR ¶ 28).

**A. Spence Created the "Coin Signals" Online Persona**

In 2017, Spence created an online persona through the use of Twitter and through messages sent using communication applications ("apps") such as Discord. Using the moniker "Coin Signals," Spence held himself out as a successful cryptocurrency trader offering investing tips and trade "signals." (A "signal" is a recommendation for an investor to buy or sell a particular asset.) The information that Spence posted to Twitter was available to the public, whereas his Discord messages were available only to

an invitation-only online group, whose members usually paid a membership fee to Spence. (PSR ¶ 11).

## B. Spence Created Cryptocurrency Investment Pools, or "Funds"

From November 2017 through April 2019, Spence created and managed several cryptocurrency investment pools, for which he solicited cryptocurrency worth, in aggregate, more than approximately $5.37 million at the time, from more than 170 individual investors. Spence solicited these investments through false representations, including that Spence's crypto trading had been extremely profitable. In actuality, Spence's trading had been consistently unprofitable. (PSR ¶ 12).

Through his Twitter account and Discord chat groups, Spence solicited investors in various cryptocurrency investment pools that Spence managed (the "Funds"). The largest and most active of these Funds were the Coin Signals Bitmex Fund, a/k/a the "CS Mex Fund," the Coin Signals Alternative Fund, a/k/a the "CS Alt Fund," and the Coin Signals Long Term Fund. Investors who wanted to participate in a Fund would transfer cryptocurrency, such as Bitcoin and Ethereum, to Spence through means of the internet, in order for Spence to invest it. Nearly all of the investors in the Funds were individual, retail customers. (PSR ¶ 13).

With respect to the CS Mex Fund, Spence represented to investors that he would invest using an online trading platform

called Bitmex, which purportedly operated outside of the United States. According to its website, Bitmex offered a Bitcoin investment vehicle called a "perpetual contract," which it described as "a derivative product that is similar to a traditional futures contract" but which has "no expiry or settlement" date. The Bitmex website further stated that a perpetual contract "is aimed at replicating the underlying spot market but with enhanced leverage." With respect to the CS Alt Fund, Spence represented to investors that he would invest in lesser-known cryptocurrencies, such as Ven, Viacoin, and ARK. (PSR ¶ 14).

For each Fund, including the CS Mex Fund, Spence, or individuals acting at his direction (the "Administrators"), created and managed chat rooms on Discord through which Spence and the Administrators communicated with investors. At Spence's direction, the Administrators performed tasks such as updating investor account balances. (PSR ¶ 15).

## C. Investors Received False Account Balances Through a "Bot"

Spence represented to investors that his trading in the Funds was executed in "rounds," the average length of which was approximately 8 days. For instance, for the CS Mex Fund, there were a total of 37 rounds in which investors could participate. At the end of each round, Spence explained that he exited all of his positions. Spence further represented to investors that this pattern of trading in rounds minimized the downside risk of

4

investing in the Funds. At the end of each round, Spence reported to the Administrators what Spence claimed was an overall percentage gain or loss for each Fund. The Administrators then entered the percentages that were communicated by Spence into a computer program (a "bot") that used the percentages to calculate each customer's account balance. Investors could request their account balance by querying the bot, and the bot would display their alleged account balances. (PSR ¶ 16).

Spence represented to investors and to the Administrators that Spence's trading in the Funds consistently resulted in outsized returns. Based on Spence's false and misleading representations regarding his profitable trading in the Funds, investors transferred additional assets into the Funds. For example, on January 28, 2018, Spence posted a message in a Discord chat group falsely claiming that his trading of investor funds over the past month had generated a return of more than 148%. As a result of this misrepresentation, investors transferred additional funds to Spence. In truth and in fact, over that same period of approximately one month, Spence's trading resulted in net losses in the accounts in which he traded investor funds. (PSR ¶ 17).

**D. Spence Defrauded an Individual Investor of Over $800,000**

Based on misrepresentations made by Spence, an individual (Investor-1) invested approximately $800,000 worth of cryptocurrency with Spence, none of which was returned to Investor-1. On May 13, 2018, Spence sent an email to another individual (Investor-2), attaching a chart that reflected a cumulative return in the CS Mex Fund of approximately 480% from January 18, 2018 through May 13, 2018. After receiving the email from Spence, Investor-2 conveyed the returns that were reflected in the chart to Investor-1. However, in truth and in fact, from its inception on November 22, 2017, through May 10, 2018, the CS Mex Fund incurred losses, not gains. (PSR ¶ 18).

Based on Spence's false representations about his profitable trading in the CS Mex Fund, Investor-1 made two investments. First, on July 17, 2018, Investor-1 invested approximately 36.8 BTC, which was worth approximately $259,000 at the time, in the CS Mex Fund. Second, on July 30, 2018, Investor-1 made an additional investment of approximately 18.7 BTC, which was worth approximately $150,000 at the time, in the CS Mex Fund. In connection with his investments on July 17, 2018, and July 30, 2018, Investor-1 entered into contracts with Spence, which stated that Spence "commits that all provided funds will be traded with the goal of increasing the amount of Bitcoin and will be done so in the best interest of the investor." On September 12, 2018,

Investor-1 queried the bot for the balance in Investor-1's CS Mex Fund account. The bot, which had been programmed with percentages of profit and loss provided by Spence to the Administrators, reported to Investor-1 an overall profit of approximately 4.0 BTC and a total account balance of approximately 59.5 BTC. However, in actuality, from July 17, 2018, through September 12, 2018, Spence's trading in the CS Mex Fund had resulted in a net loss in the Fund of approximately 92.4 BTC. On September 29, 2018, the bot reported to Investor-1 a cumulative profit of approximately 6.9 BTC, which represented approximately 12.37% total return on Investor-1's investment. However, from September 13, 2018, through September 28, 2018, Spence's trading in the CS Mex Fund actually resulted in a net loss in the Fund of approximately 10.1 BTC. (PSR ¶ 20).

On October 1, 2018, Spence posted a message in a Discord chat group claiming that the CS Mex Fund contained 1,300 BTC, which was the equivalent of approximately $8 million dollars at the time. However, the CS Mex Fund actually contained approximately 2.1 BTC, which was the equivalent of approximately $14,000 at the time. On October 2, 2018 -- based on the purported positive trading results Spence caused the bot to report to Investor-1 on September 12, 2018 and September 29, 2018 -- Investor-1 invested an additional approximately 60.6 BTC, which was worth approximately $400,000 at the time, in the CS Mex Fund. In connection with the October 2, 2018 investment, Investor-1 and Spence again entered into a

7

contract which stated, in relevant part, that Spence "commits that all provided funds will be traded with the goal of increasing the amount of Bitcoin and will be done so in the best interest of the investor." (PSR ¶ 21).

### E. Spence Used New Investor Funds to Pay Back Earlier Investors in a Ponzi-like Fashion

In order to hide his trading losses, Spence used new investor funds to pay back other investors in a Ponzi-like fashion. In total, from November 2017 through April 2019, Spence made payments of at least approximately 289 BTC, worth approximately $2.14 million at the time the payments were made, and at least approximately 31.4 ETH, worth approximately $18,000 at the time the payments were made, to investors substantially from cryptocurrency previously deposited by other investors. For example, on October 2, 2018, upon receiving 60.6 BTC from Investor-1, as described above, Spence used Investor-1's investment to repay a total of approximately 40 BTC to approximately six earlier investors. On October 1, 2018, prior to the addition of Investor-1's 60.6 BTC on October 2, 2018, the CS Mex Fund contained only approximately 2.1 BTC. (PSR ¶ 22).

### F. Spence Made False Statements to Forestall Redemptions by Investors

In late September 2018, certain investors began to request withdrawals or refunds from their accounts. However, by this time, Spence had lost nearly all of his investors'

8

cryptocurrency and could not honor those withdrawal or refund requests. On October 15, 2018, in order to forestall detection of his fraudulent scheme, Spence falsely told investors that his computer had been hacked, and that approximately 40 BTC had been stolen from the Funds. To reassure investors, Spence falsely represented that Spence possessed sufficient assets to repay the investors, and attributed the delay in processing their withdrawal requests to enhanced security measures that Spence had implemented after the hack. On November 28, 2018, Spence falsely announced to investors that "[t]he hack that happened 2 months ago ... was not 40 BTCs, it was actually 150 BTCs." There is in fact no evidence that, in September and October 2018, either 40 or 150 BTC were stolen from any account controlled by Spence. (PSR ¶ 23).

On November 4, 2018, in order to reassure investors, Spence falsely represented via a Discord message to investors that the CS Mex Fund had increased in value by almost 500 BTC since inception. In truth and in fact, from inception through November 4, 2018, the CS Mex Fund had net trading losses of approximately 230 BTC. On November 16, 2018, as investors continued to express concerns about their Fund investments, Spence provided the Administrators with video recordings purportedly showing Spence accessing his Bitmex accounts, which supposedly contained the assets of the CS Mex Fund. The videos displayed a total combined balance for Spence's Bitmex accounts of approximately 982 BTC.

Thereafter, the Administrators informed the investors that the Administrators had seen proof that Spence had sufficient funds to repay all the investors. (PSR ¶ 24).

On November 20, 2018, after the Administrators requested additional proof of Spence's assets, Spence provided the Administrators with what appeared to be proof of a balance of approximately 1,000 BTC in Spence's Bitmex accounts. However, in truth, at no point in November 2018 did the total balance of Spence's Bitmex accounts exceed approximately 11 BTC. (PSR ¶ 25).

On December 19, 2018, Spence posted a Discord message to investors stating, in relevant part:

> I've spent the past two months trying to hide my drawdowns with lies and deceit. I continually tried to stall for the positions I was in to be in a better state, but that never came. . . . I . . . continued to make things worse by making more bad trading decisions. . . . Risk is a part of the game, and I should have been more honest with my losses.

(PSR ¶ 26).

Despite admitting to having deceived investors about his trading losses, Spence also made false statements to investors in the same Discord message. For example, Spence wrote: "Up until recently, AUM [assets under management] was over 1100 btc. The gains from the past have been very real." In truth and in fact, Spence's trading activity consistently resulted in losses. (PSR 27).

**II.   The Plea Agreement, Guidelines Calculation and Restitution**

On November 30, 2021, the defendant pleaded guilty to Count One of the Indictment (Commodities Fraud) pursuant to a plea agreement (the "Plea Agreement"). As set forth in the Plea Agreement and as stated in the PSR, the defendant's adjusted offense level is 25, calculated as follows: a base offense level of six, increased by 16 levels because the actual loss attributable to the defendant's conduct was more than $1,500,000 but not more than $3,500,000; a two-level increase because the offense involved 10 or more victims; a four-level increase because the offense involved a violation of commodities law and, at the time of the offense, the defendant was a commodities trading advisor or a commodity pool operator; and a three-level reduction for acceptance of responsibility. (PSR ¶ 33-45). Based on an offense level of 25 and a Criminal History Category of I, the parties agree that the applicable Guidelines range is 57 to 71 months' imprisonment. (PSR ¶ 76). The Probation Office agrees with the parties' calculation of the offense level and Guidelines, but finds that a downward variance is warranted, and recommends a sentence of 36 months' imprisonment. (PSR at 19).

The defendant has agreed to pay restitution in the total amount of $2,847,743 to the victims of his offense and consents to the entry of a proposed order of restitution that will be submitted

to the Court under separate cover. There is no forfeiture allegation for the offense of conviction.

<u>**ARGUMENT**</u>

**I.   A Guidelines Sentence is Consistent with the Goals of Sentencing, the Characteristics of this Defendant, and the Nature of this Offense**

After calculating the applicable Guidelines range, a court may impose a sentence above or below the Guidelines range in order to meet the sentencing goals set forth in Section 3553(a), if "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into considering by the Sentencing Commission." U.S.S.G. § 3553(b)(1). Here, because no such circumstance exists, a sentence within the Guidelines range of 57 to 71 months' imprisonment is warranted.

**A. The Defendant Wrought Financial Devastation on Numerous Victims**

The first factor that Section 3553(a) requires the Court to consider is the "nature and circumstances of the offense." The fraud scheme perpetrated by the defendant spanned more than a year and a half, from November 2017 through April 2019, and targeted more than 170 individuals both in the United State and abroad. The fraud was elaborate and calculated, requiring repeated lies to investors about the alleged successes of Spence's purported funds and increasingly sophisticated means of deceiving the Administrators.

12

The financial impact of this crime on Spence's victims was enormous, and is best conveyed in the victims' own words:

- "I now have little in the way of retirement funds. The bitcoin I sent to Jeremy Spence would currently be worth over $100,000." (Daniel Hilderman)

- "This loss had a huge negative impact on my life, this amount is about 20 times the average salary in my country of residence [Portugal] and at that time this money was about 90% of my savings, after this loss I had almost nothing left behind." (Andre Viana)

- "This has had a huge impact on our family finances that will take many years to recover from." (Craig Young)

- "The money lost represented more than a full year of savings. ... Since I lost this money, I have had to borrow from my family in order to pay for my son's high school studies. ... In the 2 years following the loss, I was unable to purchase much if anything outside the bare necessities." (Karel Segers)

- "I lost a large portion of my saving which meant I struggled for a year as I had recently lost my job." (Baptiste)

- "I want Jeremy to know that the impact to our family because of his actions have been devastating." (Maurice Martinez). This victim is the father of two young children, including one with severe cerebral palsy who "needs constant care and therapy."

- "I've lost about 80% of my lifetime savings to Jeremy Spence['s] scam. As a result of this I had to cancel my relocation/buying own property plans and instead had to continue renting till today. It impacted my health too as losing lifetime savings is seriously bad. I am now 44 so it's less time to accumulate same sum in savings again than when one is in his twenties. (Vitaliy Rudenko)

13

- "The investment I lost represented more than half of my savings as well as part of my wife's savings." (Aivaras Cepelis)

## B. The Defendant Inflicted Irreparable Psychological Damage

In addition to the financial havoc that the defendant wreaked, he also inflicted psychological, emotional, and reputational harm upon many of his victims.

- "My involvement in Jeremy Spence's fraudulent pyramid scheme can only be described as one of the most stressful periods of my life. It caused me to go into depression and anxiety which made me wake up constantly in the middle of the night. It was hard to continue with my work, my business and my personal relationships, while always waiting for Jeremy's next empty promise or excuse. I had to seek medical help to overcome this difficult period. It was all consuming and has taken years for me to get past the emotional impacts on myself and my family." (Manfred Lagemann)

- "This event made me very upset and depressed, which also had a huge negative impact on my mental health and social life. ... I still have nightmares today about the fact that my investment was made with my Bitcoin savings." (José Duarte Vieira)

- "The accumulated stress and anxiety from losing so large a portion of my net worth is hard to overstate. I was a mental wreck for most of 2018 and 2019. I even began to view the people around me with distrust and I suspect it will take a long time to regain the level of trust I had in people prior to being ripped off by Mr. Spence." (Hilderman)

- "He lied hundreds of times. Ultimately, Jeremy was lying the entire time. I went through months of trying to communicate and get Jeremy to return our funds and he strung me along with zero regard for anyone but himself. He then started communicating less frequently and after the details started to emerge, he went silent. ... His actions have

14

significantly damaged close relationships in my life. It has damaged my professional reputation. It has significantly damaged my savings." (Lee)

- "It was a dark period for me; I entered a period of depression and anxiety, starting to realize that Jeremy Spence was likely not going to return my money, the nest that I was building for my wife and me. Worst of all, I was ashamed of sharing this with my wife, she depended on me to support her while she was studying." (Truque)

- "Apart from the fact, how much money we lost in this case (all our savings) ..., it had a greater impact on our lives. My wife, at the time of the ninth month of her pregnancy, began to feel anxious and suffers from this condition to this day." (Jose Quintas)

- "After I realized I lost that money, I was depressed and felt ashamed. I spent nights and days trying to communicate with Jeremy Spence and his relatives, in order to get my money or even a portion of it back. I couldn't look into my wife's eyes. I felt that I lost money for my kids." (Naor Yehudaey)

- "Now, having had to borrow from my family, I feel a level of shame. I have also become less trusting of people in general, and this may have had an impact on my relationships and how people perceive me." (Segers)

- "It deteriorated my relationship with my wife for a time being and caused a considerable amount of stress and anxiety. Also, as a result of the scam, I lost confidence and withdrew the rest of my investments from other places like my stock broker and did not reinvest until last year, which resulted in missing a bull run in the stock and cryptocurrency markets." (Cepelis)

15

### C. **The Defendant Defrauded His Friends and Ignored the Warnings of Those Who Tried to Help Him**

The second factor that Section 3553(a) requires a sentencing court to consider is "the history and characteristics of the defendant." The defendant claims that "it never fully occurred to [him] that he had serious obligations to these anonymous people or that doing so was regulated by federal laws." (Def. Ltr. 5). The letters of two of the victims, who were also friends of the defendant, tell a different story.

First, not all of the victims were merely "anonymous people" to the defendant. Mr. Truque recounts that he invited Spence to his wedding reception, noting "that's how close and trustworthy I thought he was." Mr. Lee writes that he "considered Jeremy a friend." Second, and more importantly, both Mr. Truque and Mr. Lee went to lengths to try to convince Spence to run his business in a lawful manner. Mr. Truque repeatedly explained to Spence "why the way he was managing funds on his personal account was illegal." Mr. Truque further describes his warnings to the defendant: "I had been very clear with him from the start and throughout the few months that I interacted with him, telling him many times 'What you're doing is illegal.'" While Spence appeared to listen to the advice of Mr. Truque, he took no steps to act upon that advice. "The whole time he was thankful for the advice

and gave me empty lip service that didn't materialize into actions."

Mr. Lee describes a similar experience with the defendant:

> Very early on I made it a priority to meet and try to help Jeremy Spence so that he wouldn't put himself in a bad situation based on ignorance. ... Time and time again we made it very clear that he should not be taking money from people online and that he needed to stop trading for anyone online. Through every interaction he agreed and told us it was his intention to move forward with doing things the right way.

From their months of interacting with, and ultimately falling victim to, the defendant, these two victims reached the same somber conclusion. Mr. Lee writes: "It is very important for the court to know that this was not an innocent mistake on his part. It was willful. ... Most importantly, he took advantage of good people who did nothing but try to help him." Similarly, Mr. Truque writes:

> Make no mistake, Jeremy Spence may be young, but he's not dumb and certainly not naïve. He's a master manipulator and he cannot claim ignorance given he had plenty of good advice from experienced people. My advice alone would have prevented his current fate. He knew what he was doing, he willfully did what he did.

The accounts of these victims paint a picture of the defendant that is very different from the face he now presents to the Court.

17

**D. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants**

Section 3553(a) emphasizes "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." This provision is meant to discourage unwarranted discrepancies in sentencing nationwide. *See United States* v. *Frias*, 521 F.3d 229, 236 (2d Cir. 2008). But we need not look far to see that imposition of a Guidelines sentence in this case would be consistent with Guidelines sentences imposed on similarly-situated defendants. One example is Judge Rakoff's imposition of a 48-month term of imprisonment on a first-time offender who, along with his co-conspirators, defrauded investors of $2.3 million by making false claims about a purported snack food company that he helped run, and whose Guidelines range was 41 to 51. *United States v. Barry Schwartz*, 17 Cr. 638 (JSR). Another example is Judge Wood's sentence of 46 months for a first-time offender who defrauded approximately 30 investors of a total of $1.5 million by making false claims about his positive trading results and whose Guidelines range was also 41 to 51 months. *United States v. Williams Wells*, 15 Cr. 885 (KMW). In the case of Spence, a sentence within the Guidelines range of 57 to 71 months would avoid unwarranted sentence disparities among similarly situated defendants.

### E. A Substantial Sentence is Needed to Afford Just Punishment and Adequate Deterrence

The Government submits that the need for just punishment and general deterrence also calls for a Guidelines sentence. Unfortunately, investment-related frauds and Ponzi-type schemes such as Spence's are all too common. Whether Spence initially set out with the motivation to defraud or not, he quickly found himself in the situation where he faced a choice: he could either take responsibility and admit his losses to his investors, or he could deceive his investors and the Administrators with increasingly elaborate lies, and then double down on his failed investment strategy in an attempt to recoup his losses. This choice presented itself to Spence not once or twice, but literally every day for a period of many months. And time after time, he made the decision to perpetuate the fraud – to place his own interest before the interests of his investors, many of whom had trusted him with substantial portions of their life savings. Every day, other fraudsters just like Spence are faced with the same decision: come clean or double down. Spence's punishment needs to convey to these individuals that digging the hole of fraud deeper is not the solution.

"While all the other factors under section 3553 partake to a lesser or greater degree of policy considerations, 'just punishment' taps a deeper vein." *United States* v. *Gupta*, 904 F.

19

Supp. 2d 349, 355 (S.D.N.Y. 2012). It would be a manifest injustice to sentence Spence to anything short of a substantial term of imprisonment. And "[w]hile no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant." *Id.*

## II.  The Mitigating Factors Presented by Spence Do Not Justify a Below-Guidelines Sentence

Spence presents a number of mitigating factors in support of his request for a non-incarceratory sentence, including his age, his health, his status as a first-time offender, and the distress he has already endured as a result of pleading guilty. As explained below, none of these factors justifies a below-Guidelines sentence.

Unlike many criminal defendants who appear in this court, Spence was fortunate to grow up in a stable middle-class home, with a loving family and caring teachers, and then to attend an elite private university. What he does have in common with many other defendants is that he is a first-time offender, and that he was in his 20s when he committed his offense. These circumstances in no way remove him from the heartland of offenders.

Similarly, the medical condition for which Spence is currently being treated is not a reason to impose a shorter prison term. According to Spence, it is unknown at this time whether he

needs further treatment for this condition. Should it turn out that he does require further treatment, there is no reason to believe that such treatment could not be completed prior to his surrender date. While the need for addition therapy may justifiably delay his surrender date, it should not be a reason for a shorter prison sentence.

Finally, Spence claims that a non-incarceratory sentence is warranted because he "is already humbled, embarrassed, and ashamed," including by the fact that his "apprehension and criminal prosecution was covered by the press and any Google-search of his name reports his arrest and guilty plea." (Def. Ltr. 15, 16). Many of the letters submitted on Spence's behalf make some variation of the argument that Spence has already been punished enough through the reputational harm he has suffered since his arrest. But "it is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction." *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012). Similarly, the felony conviction associated with Spence's name are not factors this Court should take into account. "None of these things are his sentence. Nor are they consequences of his sentence; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." *United States* v. *Musgrave*,

761 F.3d 602, 608 (6th Cir. 2014) (quotations omitted); *see also* *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status."). And, as the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999).

<u>**CONCLUSION**</u>

For the reasons set forth above, given the nature and circumstance of the offense, the characteristics of the offender, the need to avoid unwarranted sentence disparities among similarly situated defendants, and the need to afford just punishment and adequate deterrence, the Government respectfully submits that a Guidelines sentence of between 57 and 71 months is sufficient but not greater than necessary to meet the ends of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: <u>/s/ Christine I. Magdo</u>
Christine I. Magdo
Assistant United States Attorney
(212) 637-2297

cc:  Sylvie Levine, Esq.

23