M5B5speS

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               21 Cr. 116 (LAK)

JEREMY SPENCER,

                Defendant.

------------------------------x

                                             May 11, 2022
                                             4:05 p.m.


Before:

                    HON. LEWIS A. KAPLAN,

                                        U.S. District Judge



                        APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
BY:  CHRISTINE I. MAGDO
     Assistant United States Attorney

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
BY:  SYLVIE J. LEVINE
     NEIL P. KELLY

ALSO PRESENT:  BRANDON RACZ, Special Agent, FBI
```

M5B5speS

1          (Case called)

2          THE DEPUTY CLERK:  Government, are you ready?

3          MS. MAGDO:  Yes.  Assistant U.S. Attorney Christine

4    Magdo for the government.  With me at counsel table is FBI

5    Special Agent Brandon Racz.  Good afternoon.

6          THE COURT:  Good afternoon.

7          THE DEPUTY CLERK:  Defendant, are you ready?

8          MS. LEVINE:  Yes.  Thank you.  Good afternoon, your

9    Honor.  The Federal Defenders of New York by Sylvie Levine and

10   Neil Kelly, on behalf of Mr. Jeremy Spence.

11         THE COURT:  Ms. Levine, have you and your client had

12   the report for the necessary period?

13         MS. LEVINE:  Yes, sir.

14         THE COURT:  Mr. Spence, have you read the presentence

15   report?

16         THE DEFENDANT:  Yes, your Honor.

17         THE COURT:  And not meaning to be flip, have you read

18   every word of it?

19         THE DEFENDANT:  I have.

20         THE COURT:  Have you discussed it fully with

21   Ms. Levine?

22         THE DEFENDANT:  Yes, I have.

23         THE COURT:  The presentence report will be sealed and

24   made available to counsel in the event of an appeal.

25         Now, I have noted one great big error in the

M5B5speS

1    presentence report in paragraph 6(a)(3) where it says the loss

2    amount was greater than $150,000 but not greater than $350,000.

3    Those figures are wrong.  The loss amount is greater than

4    $1,500,000 but not greater than $3.5 million and I will make

5    that correction.

6            Are there any other unresolved objections to the

7    presentence report?

8            MS. MAGDO:  Not from the government.

9            THE COURT:  Ms. Levine?

10           MS. LEVINE:  No, your Honor.

11           THE COURT:  Thank you.

12           I adopt the presentence report and the guideline

13   computation and range that it contains.

14           Now, for the sake of good order I have received, in

15   relation to the sentencing:  The presentence report; a proposed

16   consent order of restitution; a letter from Ms. Levine dated

17   May 9th; victim impact statements under a cover letter from the

18   U.S. Attorney's office from Craig Young, Maurice Martinez.  I

19   have received a sentencing memorandum from the government that

20   was filed on May the 6th, to which there is a small pile of

21   attachments and an extensive sentencing memorandum from

22   Ms. Levine dated the 29th of April.

23           Is there anything else of which I ought to be aware?

24   Ms. Magdo?

25           MS. MAGDO:  Not from the government.  Thank you.

M5B5speS

1          THE COURT:  Ms. Levine.

2          MS. LEVINE:  No, your Honor.

3          THE COURT:  All right.  Now, I gather there are

4     victims of this crime who want to be heard on sentencing; am I

5     right?

6          MS. MAGDO:  Yes, your Honor; there are two.

7          THE COURT:  All right.  And they are?

8          MS. MAGDO:  They are Mr. Jeremy Lee and Mr. Daniel

9     Truque.

10          THE COURT:  Is it Mr. Reed?  Was that the first name?

11          MS. MAGDO:  Lee, L-E-E.

12          THE COURT:  Mr. Lee, you can come to the lectern here,

13     and as long as you are at the lectern you can take off your

14     mask, and I am happy to hear what have you to say.

15          MR. LEE:  Thank you, your Honor.  So I am just going

16     to read my statement:

17          I, like many other people, met Jeremy Spence online.

18     He had been placing trades and seemed to have potential in

19     terms of calling --

20          THE COURT:  I am going to have to ask you to go a lot

21     slower because my old ears are no longer as quick as they used

22     to be.

23          MR. LEE:  Sure.

24          I, like many other people, met Jeremy online.  He had

25     been posting trades and he seemed to have potential as a

M5B5speS

| | |
|---|---|
| 1 | trader.  He was calling trades before they happened and he |
| 2 | became pretty famous, pretty quickly, online.  I started to get |
| 3 | a following and I was excited about interacting with him.  The |
| 4 | crypto markets were brand-new, not a lot of institutional |
| 5 | traders were in that environment and so it was really kind of |
| 6 | the wild west, so to find someone who could navigate that |
| 7 | environment with the complexity of it was exciting.  I |
| 8 | initially wanted to learn from him and, you know, very |
| 9 | instantly I saw that he was an introverted guy and so I wanted |
| 10 | to help connect him with other people. |
| 11 | My background is in technology.  I moved into fintech |
| 12 | just a few years ago, I moved up from Texas to New York and I |
| 13 | amassed a pretty large network of pretty influential people in |
| 14 | both the stock market and crypto world. |
| 15 | I made it a strong priority to help him.  I went out |
| 16 | of my way, spent a lot of time to help him so that he would not |
| 17 | put himself in a bad situation.  Crypto acted like it was not |
| 18 | going to apply to the real world in terms of SEC laws.  I heard |
| 19 | from people that I was very connected with that that was not |
| 20 | true and every bit of advice that I gave him was to keep him as |
| 21 | protected as anyone in the crypto world. |
| 22 | So when I did meet him, I was surprised that he was |
| 23 | very young, very introverted, and he did not have a lot of |
| 24 | professional experience.  So I went ahead and started to put |
| 25 | him in touch with those people, one of which is Dan who is |

M5B5speS

1  here.

2          Sorry, I'm catching up here.

3          So once I started talk to him and met him in person,

4  he seemed quite excited about the opportunities in terms of the

5  network that I put him in touch with.  We decided very early on

6  that what he was doing with these retail traders of which he

7  was keeping a mask on -- he would not tell us -- but what he

8  was doing was very large and he was taking in a lot of money.

9  And once we found out about that we told him that he could not

10  do that.  And so, we went and set up a hedge fund for him.

11  It's not cheap, it's not easy.  We did all of this for him.  We

12  hired fund administrators.  We did a lot of work.  I went out

13  of my way to learn the laws just so he wouldn't get in trouble.

14          So time and time again I made it very clear that he

15  should not be taking money from people online and that he

16  needed to stop trading for anyone that was not a sophisticated

17  or accredited investor.  Through every interaction he agreed

18  and told us it was his intention to move forward with doing

19  things the right way.

20          While waiting for this fund to be set up outside of

21  our normal jobs, I had given him a significant amount of money

22  to trade for me.  I felt with my connections legally and

23  professionally, we hooked him up -- with this person was in a

24  fund, a premiere patent attorney who works for Morgan Lewis.  I

25  mean, these are not small-time people.  I felt with my

M5B5speS

connections legally and professionally that he understood the

seriousness of handling this money so I felt it was safe.  I

did a background check on him and saw that he had nothing in

his background.

      One of my best friends was as excited about crypto and

he wanted to set aside some money to invest.  He did not have

anybody to trade for him and he did not have time to trade.  He

knew that I had money with Jeremy and he wanted to give him

significant capital.  I warned him of the risk and told him

that there are many hedge funds now starting form in the crypto

space and he should probably wait for that.  He said that he

wanted to meet Jeremy so he flew up to New York and he met him.

And Jeremy assured him a hundred percent his money was safe.

This, according to the last I talked to the FBI, was after he

was already losing money.  He posted fake returns of

significant amounts of capital and took $800,000 from one of my

best friends.  Come to find out, at least from what I

understand, he never invested any of Peter's money, he turned

around and started paying other people.

      So at the end of the year, tax season comes around.

We gave him tax advice.  Peter needed his money for taxes.  I

went through four days of spending 12 hours on the phone with

this dude.  And lie, lie, lie, lie, lie.  I don't know if he

had the money.  I don't know what he did with the money at that

point.  I was on the phone all night with him, extremely

M5B5speS

1    stressful.  At that point my buddy was in Europe.  I had to

2    call him overnight and I had to tell him I don't think you're

3    going to get your money back.  Not a fun call.

4            At that point I found out the FBI was looking into him

5    and he started to pull away from me and stopped talking.  At

6    the same time, he got an attorney and before he fully pulled

7    away he kept telling me, oh, it's going to be fine.  It's going

8    to be fine.  Just lying, every word that came out of his mouth.

9            So at the end of it, the last time I spoke to him he

10   told me still, Peter's money was safe, it was in a different

11   fund.  He also told me it was his express purpose to subvert

12   law enforcement and to subvert the court system by hiding

13   BitCoin and if he were to go to jail, that he is going to hide

14   money and that when he gets out, he is going to leave the

15   United States and he is going to live like a king with all that

16   money because BitCoin has gone up a ton.  And when I talked to

17   the FBI, they said they don't think that's the case.

18           It is not that difficult to wash money in the crypto

19   space.  I do not have any confidence -- no offense to the FBI

20   or anything -- but I did look at it, it is my expectation that

21   it was his express purpose to subvert the law and that is still

22   his purpose.

23           So it is very important for me to know that he could

24   not have had better humans around to help him.  I spent a ton

25   of effort.  I coached him on the importance of honesty,

M5B5speS

1    integrity, building things the right way, surrounding yourself

2    with good people.  I introduced him to extreme professionals.

3    We set up a fund.  We spent money to set up that fund.

4           So this was not an innocent mistake on his part.  It

5    was willful.  He had every opportunity to do the right thing

6    and he not only made mistakes but willfully stole a million

7    dollars from one of the nicest people I have ever met.  His

8    actions have significantly damaged close relationships in my

9    life, it has damaged my professional reputation, it has damaged

10   my savings, and if he was at all responsible with my funds, I

11   would have a lot more money right know if he had just held it,

12   if he just didn't lie about it.

13          So most importantly, he took advantage of people that

14   reached out to try and help him on their own time that are good

15   people.  So based on Jeremy's willful, consistent lies, and

16   pattern of fraud, I would expect that the Court take very

17   seriously what he has done and that this is not just some young

18   kid who didn't know what he was doing.  He had hundreds of

19   opportunities to do the right thing.  He lied at every step of

20   the way and he never once chose to do the right thing.

21          So I would appreciate it if this is factored into

22   sentencing and I thank you for your time.

23          THE COURT:  Thank you.

24          The next victim witness is?

25          MS. MAGDO:  Mr. Daniel Truque.

M5B5speS

| | |
|---|---|
| 1 | THE COURT:  Please come up, sir.  You may proceed. |
| 2 | MR. TRUQUE:  Thank you. |
| 3 | Just to give you some background, I have been in |
| 4 | finance for over 15 years now.  I started my career at McKenzie |
| 5 | working for the risk management practice during the financial |
| 6 | crisis so helping financial institutions gracefully implode or |
| 7 | evolve from hairy situations.  So I have had a long background |
| 8 | in terms of regulation and how to do things properly in the |
| 9 | financial arena.  I did work for HSBC Bank, this was during the |
| 10 | time after 2008 where you had all the additional compliance |
| 11 | relations, etc., and that ginormous burden that the banks had |
| 12 | to deal with to avoid another implosion.  I have taken multiple |
| 13 | Financial Series licensing exams. |
| 14 | So what I am trying to tell you is that I know the |
| 15 | regulations, I know how these things work.  On top of that, I |
| 16 | worked at both Bridgewater and AQR Capital.  Bridgewater and |
| 17 | AQR are the two largest quantitative hedge funds in the world, |
| 18 | they both manage close to a trillion dollars each.  I have |
| 19 | experience on how to do this. |
| 20 | When Jeremy came to me -- and just to distinguish |
| 21 | here, when I mention "Jeremy" I am talking about Jeremy Lee. |
| 22 | Jeremy Spence I'm going to refer to as Little Jeremy, that's |
| 23 | what we refer to just him to differentiate, so that way there |
| 24 | is no confusion there. |
| 25 | I met Little Jeremy in early 2018, like many of his |

M5B5speS

1    victims, through word of mouth; in this case through my friend

2    Jeremy.  His alleged returns were impressive.  I had already

3    fallen for the crypto fever like many others.  Questions that

4    many of you may ask is why trust a kid in college still trading

5    the crypto markets?  The crypto markets are heavily

6    inefficient.  They are new markets, they are driven a lot by

7    sentiment and by community, and if you have somebody like

8    Little Jeremy that can spend -- glued to their monitor 24 hours

9    a day to understand what people are talking about, it was very

10   feasible that somebody in his position and with the connections

11   that he had, call it in the cryptosphere, he could actually be

12   able to foresee or predict the movements in the markets.  So it

13   is not that we just jumped blindly into something.  As my

14   friend Jeremy mentioned, he had seen how Little Jeremy's

15   reputation online was growing and how he was accurately

16   predicting different market moves ahead of time.

17        So after meeting with him and explaining to him my

18   background, I told him two very clear things:  The way you are

19   managing funds in your personal account is illegal; and number

20   two, I can help you become a successful fund manager which is

21   what you are aiming to be.  He loved the idea, he seemed eager

22   to create a new fund.  And, alongside Jeremy, we went ahead,

23   hired lawyers, and created the golden standard of hedge fund

24   structures which is a Cayman Islands based master fund with a

25   Cayman Islander Feeder Fund and a Delaware Feeder Fund.  These

M5B5speS

1    are the golden standard of hedge funds.  Traditional hedge

2    funds use this and so we are separating the interest of onshore

3    investors and offshore investors in terms of sophistication.

4    There is cheaper ways of building a fund but this is the way to

5    do it if, in the future, you want to attract institutional

6    capital and sophisticated investors.  We took care of

7    researching not only the legal but also, as my friend Jeremy

8    mentioned earlier, looking at different fund admin

9    relationships, the auditors, the banking requirements, etc.  We

10   had all of that in mind.

11        While the necessary entities on paperwork were created

12   and to avoid missing out on the returns, I gave him some money

13   to manage for me.  I told him I would not pay for performance

14   because that was flat out illegal.  Also, even though there was

15   not a formal contract or guarantee between him and I, I

16   calculated that he would not bite the hand that would make him

17   into a bigtime hedge fund manager.  I saw a lot of potential in

18   him -- and I was wrong.

19        Less than a year later, he never returned the more

20   than 20 BitCoins I gave him, which are worth today close to

21   $1 million.  And that is despite BitCoin Prices having dropped

22   recently over 50 percent so let's keep that clear.  The money

23   that I gave him would have been worth way over a million

24   dollars today.

25        At some point the assets, the digital assets that he

M5B5speS

1    was managing, were worth well over $10 million.  I understand

2    the Court only looked at the dollar value but, let's be clear,

3    the digital asset space is more than established by now, these

4    assets have a value, and at some point he was managing over

5    $10 million that suddenly, somehow, disappeared.

6            Again, I am here with Jeremy my friend in the idea

7    that I don't think that money disappeared.  That money is

8    somewhere and Little Jeremy had mentioned very clearly that if

9    he ever got into trouble, he would simply hide the money.

10   Whether that is realistic or not in today's day and age where

11   all the wallets can be traced fairly closely and we have seen

12   examples of past hacks where the money comes up, that was his

13   intention.  And I don't know whether the -- how much reach the

14   FBI has into researching this but, again, that was his

15   intentions and I believe that there is probably, very likely,

16   still some crypto currency stashed away for him to get it out

17   and enjoy it in the future and have his great payday while the

18   more than a hundred victims are still here lamenting what

19   happened back then.

20           There was a guy on the west coast in California, he

21   actually gave him money that -- it was a bad idea, but money

22   that he was supposed to use to pay for his college loans.

23   There was another guy in Florida that was the one actually

24   setting up the box that he created on this online chat

25   application where they could show automated reports -- all of

M5B5speS

these reports were fed by data that he gave.  So a lot of people helped him set up stuff and he was just using everybody and fabricating reports.

I had been very clear with him from the start and throughout the few months that I interacted with him telling him many times what you are doing is illegal.  He insisted on continuing to trade while we finished setting up the fund.  I told him there were legal ways to do this but, most importantly, he could not charge a management fee in the meantime.  Later I find out that he renamed that performance fee "a tip" in this online chat application where he would do the reports.  I told him that a tip, if mandatory, is still illegal.  It is not allowed.  He ignored it.  I went as far as to clarify in these words:  A mandatory tip is still a performance fee and it is illegal.  You cannot do this.

Then came the spring tax season.  I warned him, you have to pay taxes on the trades that you have been doing because all of these digital assets you have been trading on your personal accounts.  The IRS doesn't care that it is not your money.  The IRS only cares that your accounts are trading crypto assets that should pay taxes.  Set money aside to pay those taxes and when you return money and gains to your investors, you need to deduct those taxes.  He never did.  And I'm sure there is many other taxes that he didn't pay on top of that.

M5B5speS

1          I highlighted the importance of having a formal hedge
2     fund structure out of the Cayman Islands and the Delaware
3     Feeder so that investors would be trustworthy of the golden
4     standard of hedge funds.  Again, he always said yes, yes, we
5     are going to do this.  I asked him several times to look at the
6     list of his investors, figure out who were credit debts so they
7     could be given subscription agreements for the new fund and
8     then weed out and kick out any of the non-accredited investors
9     who would not be eligible to invest in this type of fund.
10    Again, the whole time he was thankful for the advice, always
11    complimentary, and gave me lip service that didn't materialize
12    into action.
13          Then came the summer.  This is when things started
14    getting bad.  It was kind of, like, a weird time in my life, I
15    actually got married in July of that year, 2018.  I even
16    invited Little Jeremy to my wedding celebration.  In the end,
17    he showed up late and apparently wasn't even wearing dress
18    shoes and didn't get in.  Or, maybe that is just the excuse
19    that he gave me and he never showed up to the venue.  But this
20    is just to show how tight we were supposed to be back then and
21    how badly he was misleading everybody who was trying to help
22    him.
23          In the fall, my wife left for her NYU study abroad
24    semester in Ghana.  Meanwhile, I couldn't travel.  I couldn't
25    work because I was still processing the marriage-based Green

M5B5speS

1    Card and my previous employment work visa had expired.  So I

2    was in a situation where I couldn't travel, I couldn't work,

3    and I had no money.  A lot of the money, I had given it to

4    Jeremy.  I was hoping to build a nest for me and my wife and,

5    instead, he disappeared everything.  What would have been

6    something that would have given my wife and my future family

7    security essentially disappeared thanks to his complete

8    disregard for other people.

9          It was a dark period for me.  I entered a period of

10   depression and anxiety.  I started to realize that Little

11   Jeremy was likely not going to return my money.  The nest I

12   built for my wife and me was gone.  Worst of all, I was ashamed

13   of sharing this to my wife -- with my wife.  She depended on me

14   for support while she was still pursuing her studies.

15   Naturally, I became with conserving cash, going as far as

16   checking out the nut section at Duane Reade when they would be

17   because they were a dense source of nutrition.  I literally had

18   no cash to, like, even pay rent.  At some point I tried selling

19   a couple of BitCoins that I had left to pay rent and, lo and

20   behold, I got scammed online thanks to Chase Bank reversing a

21   Zelle transaction which is supposed to be absolute but that's a

22   story for another day.

23         Everything in my life seemed to be spiraling out of

24   control and Little Jeremy, of course, stopped communicating

25   with us -- most likely ashamed and most likely given advice

M5B5speS

from his lawyers in terms of communicating with people in his
"quote unquote" fund.

Make no mistake, Little Jeremy has nothing of little.
He is young, sure; 20-something.  But he is not done and
certainly not naive.  He is a master manipulator and cannot
claim ignorance.  He got plenty of good advice from experienced
people.  My advice alone would have prevented his current fate.
He knew what he was doing, he willfully did what he did.  He
even once said that if he got in trouble, he would stash away
crypto currency.  I mentioned this before, I mention it again
because it is something that is a key point of contempt for
Jeremy and I, knowing that he likely will have that nest
stashed away somewhere in the future.

In the end, I have actually coached other managers
just like Little Jeremy was the first one, I have coached other
managers.  I am actually launching an FX trading fund by the
end of the month.  This is a fund that is already looking very
promising, we already raised $5 million from investors, credit
investors with all the relevant bells and whistles required by
law and regulation.  There is three other managers in the
pipeline for the rest of the year.

Jeremy Spence -- Little Jeremy sitting right there --
he could have been one of them and he chose not to.  He chose
to go the wrong way, he chose to go the illegal way.  He chose
to ignore all the good advice that people with experience in

M5B5speS

1    the industry gave to him.

2              And one last thing before I go.  The fact -- I just

3    heard Jeremy mentioning -- my friend Jeremy -- mention that the

4    money his Peter, his other friend gave to Little Jeremy

5    apparently was paid out to other investors that were cashing

6    out.  I don't need to have been in finance for 15 years to know

7    that when you pay out your investors with money from other

8    investors, it is what is usually described as a Ponzi scheme.

9    So let's keep that clear.  If he actually did that and he was

10   actually not making returns, then this is even worse than it

11   sounds.

12             That's all I have.  Thank you very much.

13             THE COURT:  Thank you.

14             Ms. Levine.

15             MS. LEVINE:  Thank you, your Honor.

16             Jeremy was 21 and then 22 years old when he committed

17   this crime.  He was an introverted college dropout who became

18   enthralled with the burgeoning world of cryptocurrency, and in

19   less than a year he got in way too fast and way too deep and he

20   made loads of mistakes and he lied.  He committed a federal

21   crime and the whole thing crumbled around him, and that

22   crumbling took place at the end of 2018 which is now three and

23   a half years ago.  And over the course of the last three and a

24   half years, Jeremy has lived every single day with the

25   consequences of his misdeeds.

1          His downfall was blasted across the crypto world.  He

2     was sued by the investors.  There are civil judgments from this

3     building that have been entered against him.  He was sued by

4     the CFTC.  And, on a personal level, he left New York, he moved

5     back in with his parents, he is completely reliant on them, and

6     he is broke.  He is at home.  He sometimes mows lawns for money

7     or does small graphic design jobs.  His days in the online

8     financial markets are completely behind him.  Jeremy already

9     lives with the total and utter failure of his venture into the

10    cryptocurrency world every single day.  And for his crime, he

11    pled guilty to his first ever conviction, a federal felony, and

12    I think that's where I have to start responding to something

13    the victims just said which is the suggestion that he never

14    once did the right thing.

15         Your Honor, pleading guilty was the right thing.

16    Pleading guilty was an important and necessary step towards

17    making amends for the crime that he did in fact commit.  And he

18    has apologized for his actions.  He did so in his letter to

19    your Honor.  And in that letter he specifically apologizes to

20    the investors who had trusted him.

21         Now, this entire thing was ill-conceived from the

22    beginning.  Jeremy never should have been trading with so

23    little expertise no matter how ambitious he was, or nerdy he

24    was, or excited he was about crypto.  He told your Honor in his

25    letter it was poor decision-making to be in that world to begin

M5B5speS

1    with, he was out of his depth.  And so, the question we are all

2    here to talk about today and the question that your Honor has

3    to decide is all these years later is does he need more

4    punishment and, if so, how much punishment is enough.

5            Now, Jeremy has never been to prison for a day in his

6    life.  He has never been on probation.  He has never been on

7    home detention.  He has never been mandated to do community

8    service.  And we submit that there are many ways that this

9    Court can punish and specifically deter Jeremy without

10   requiring that he go to jail.  And a guideline sentence, which

11   is essentially five years, when Jeremy has never been to jail

12   for so much as five hours, is vastly greater than necessary.

13   It would be inconsistent with the 3553(a) factors and it would

14   be inconsistent with the interests of justice.

15           Now, your Honor knows from our materials that this

16   case marks Jeremy's first ever contact with the criminal

17   justice system.  Ever.  He has zero criminal history points.

18   And the statistics from the United States Sentencing Commission

19   tell us that people with zero points -- people like Jeremy --

20   have the actual lowest rate of recidivism of anyone who comes

21   with this system, even though lower than people with just one

22   point even though they're in the same category.  And I think

23   the reason for this is that people who live law-abiding lives

24   and then step off track for the first time don't need that much

25   work to get back on track.

M5B5speS

1        This whole experience from his arrest through today is

2   designed to send a specific message to Jeremy, and others:  Do

3   not ever do anything like this again.  And there is simply no

4   question that Jeremy has heard that loud and clear.  And again

5   I say, there are lots of ways your Honor can drive that point

6   home -- put him on an ankle bracelet, lock him in his house,

7   mandate community service, have him pay the community back for

8   the wrongs that he has done, and of course by requiring

9   restitution which Mr. Spence has agreed to, he signed a

10  prospective restitution order, and that way he can work to pay

11  off his victims.  Jail is not necessary here and the numbers

12  requested by the government are just vastly inappropriate and

13  unjust.

14        Now, your Honor is well familiar and read in our

15  letter and has read in other letters over the years the

16  critique of the guideline section that applies here, 2B1.1, and

17  I won't belabor it but beyond to say this:  The Second Circuit,

18  and many District Courts, have criticized the structure of this

19  guideline because the way that 2B1.1 is written, the Sentencing

20  Commission decided to make the base offense level low.  It

21  starts at six, and then it rises at a prodigious rate based

22  solely on loss amount and at intervals that are larger than we

23  see for weapons cases or for bodily injury cases, and in ways

24  that the Second Circuit has specifically said are not

25  empirically based.  And here it is that loss amount enhancement

M5B5speS

1   that changes Jeremy's guidelines from 6 to 12 months to 57 to

2   71 months.  It is a perfect example of how this unjust

3   guideline falls on folks.  And so we ask your Honor to consider

4   these arguments and not use this overblown guidelines range as

5   a starting off point in this case.

6            Now I want to talk for a minute about both specific

7   and general deterrence.  The government, in their letter, said

8   that Jeremy's public shaming -- which of course they don't

9   dispute -- you can't Google his name without reading all about

10  this -- this public shaming accomplishes I think both specific

11  and general deterrence.  It is specific because it has, as I

12  described at the beginning, long before any Court systems got

13  involved, the crypto market -- this online world -- found out

14  what happened, they publicized what happened.  And as a

15  practical matter, no one is ever giving Jeremy any money ever

16  again to do anything with.  He is out of the financial business

17  for good.  This whole thing has been life-changing for this

18  25-year-old.

19           And I think it is worth noting that in recommending a

20  downward variance, the Probation Department specifically said

21  we do not think specific jail time is necessary for specific

22  deterrence.  We believe that he has been specifically deterred

23  already.

24           And so that leaves us, of course, with general

25  deterrence.  And this is kind of an interesting case because in

M5B5speS

1    a lot of cases, I think general deterrence is kind of -- is

2    more theoretical than it is actual because we don't know

3    exactly who is learning about the outcome of any particular

4    case.  But in this case, because it all happened online,

5    because it was all taking place in an online forum, his

6    downfall was documented in great detail on online fora.  In our

7    papers I cited to many, many, many websites that tell the story

8    of Jeremy's crime and its consequences.  It was true when the

9    fund collapsed, it was true when he was sued, it was true when

10   got arrested.  There has already been a bright shining warning

11   to that community that you shall not and should not engage in

12   the same mistakes that Jeremy did.

13          Now I want to talk a little bit about the context in

14   which this offense was committed and I am going to agree with

15   something that Mr. Lee said which is the crypto world,

16   particularly back in 2017 and 2018 when Jeremy was trading, I

17   had written in my notes the wild west, which is exactly what

18   Mr. Lee said.  It is nothing like the traditional financial

19   markets.

20          Traditional financial markets have gatekeepers.

21   Right?  You usually need credentials for people to invest lots

22   and lots of money with you but here, no such thing existed.

23   Investments were made from one anonymous online screen name to

24   another anonymous online screen name in a world of chat boxes

25   and expletives and no capitalization.  People were extremely

M5B5speS

1    eager to break into this world.  I think one of the victims

2    just called it "crypto fever."  And people -- smart people,

3    sophisticated people -- were desperate to break into these

4    online markets.  And they sent Jeremy money and many of the

5    investors didn't even know him as Jeremy, they knew him as a

6    cartoon avatar of an igloo.  And I will share with your Honor

7    that I called it an igloo in my papers.  Jeremy corrected me

8    that it is a picture of a whale.  But that's the point, it was

9    a hard-to-see cartoon that they were investing their savings

10   with.

11            THE COURT:  Is it still possible for somebody to do

12   that now?

13            MS. LEVINE:  That's a good -- so I -- it is probably a

14   better question for the FBI but, as I understand it, there has

15   been more regulation brought into these markets than there was

16   then.  I think you can invest money via the Internet, like I

17   think people are able to, but I do think that regulation has

18   advanced in the forum.  At the time Jeremy was doing it there

19   was none, as I understand it.

20            THE COURT:  That doesn't help answer my question.

21            MS. LEVINE:  I guess I don't really know the answer to

22   your question.

23            THE COURT:  So there is no way I can have total

24   confidence that six months or a year from now this defendant

25   doesn't invent a new avatar and stick it on the web and start

M5B5speS

1    doing this all over again.  Right?

2              MS. LEVINE:  So I guess -- I guess not -- no, there

3    would be nothing stopping him.  However, I guess there are

4    things that would stop him, here is what they are.  The first

5    is I think that Jeremy is an entirely different place in his

6    life than he was in 2017, not least of all now having been

7    prosecuted fully and admitted to a federal felony.  Right?

8    This whole process is supposed to teach people lessons and we

9    have no reason to think he hasn't learned his lesson loud and

10   clear.

11             Second, you have the last 15 months of Jeremy -- the

12   last 15 months of full compliance with pretrial release and

13   with the FBI knowing a whole lot about Jeremy, they know a lot

14   about his finances.  They are well-acquainted with him and

15   there has been absolutely no hint that he has so much as logged

16   onto any of these online fora and done anything there.

17             And then, of course, the future is different than the

18   past because when Jeremy is placed on supervision, which he

19   will be in any sentence your Honor gives, your Honor can

20   mandate that the probation office be given access to his online

21   devices.  The Probation Department here can literally monitor

22   that behavior to prevent it from happening.  Your Honor can

23   also add additional --

24             THE COURT:  If they know the universe of devices, yes?

25             MS. LEVINE:  That's correct.  But there is absolutely

M5B5speS

1    nothing in Jeremy's history, to date, of hiding -- once this

2    case started there have just been no incidents.  Your Honor and

3    I both see lots of cases where during pretrial supervision we

4    see people re-offend, we see people relapse, we see people hide

5    things, we see people have secret devices.  There has been no

6    such allegation in this case and I submit to you it is because

7    he is broke and living under the roof of his parents.  This is

8    not someone who is out in the world in the same position as he

9    was before.  So I think there is absolutely no indication of

10   relapse, there is no indication of repeated behavior.  And your

11   Honor has three and a half years to look back at.  The FBI was

12   very, very, very involved in Jeremy's devices, account numbers,

13   account names.  They know everything about him and in three and

14   a half years, there is no suggestion that he has done such a

15   thing.

16           THE COURT:  They know everything about him except what

17   they don't know.

18           MS. LEVINE:  Well, I suppose that's true but they've

19   done a lot of legwork and this is not a person who was

20   particularly sophisticated, he is not a person who -- I mean, I

21   think we all agree -- the victims, FBI, and I -- all agree that

22   this was a young kid who got in too fast.  He doesn't have the

23   kind of sophisticated Cayman Islands hedge fund connections

24   that even the victims have.  He just didn't have such things.

25   And I know the victims say they tried to give him those things

M5B5speS

1    and that it was pretty much an utter failure because he was

2    sitting alone behind his laptop clicking buttons.  He just

3    didn't have the wherewithal for such additional bad acts.

4              And so, it is really hard when you read the discovery

5    in this case.  It is almost hard to believe, even though I know

6    fully what he is charged with -- and I don't know anything

7    about cryptocurrency -- but you read the discovery in this case

8    and it is almost hard to believe that, like, one chat avatar

9    that is a picture of a rodent who is using, like expletives and

10   lower case letters to another avatar that's a picture of a

11   whale, and they have names like Bruce Halftroll, and Jeremy is

12   posting things like "invest in this squiggly line," and "just

13   kidding, I suck," that in that world it's almost hard to

14   believe that that's a real financial market.  And of course it

15   was, I'm not disputing that it was, but I really do believe

16   that a kid -- a 21-year-old college dropout who got kind of

17   wrapped up in this in the way that social media wraps people

18   up, it would have been really, really hard to appreciate how

19   unregulated, how in such an unregulated, anonymous world how

20   the -- like how those consequences would translate to real

21   life.  And of course Jeremy didn't think those things through

22   and that's why he is here but he absolutely has now.

23             There is no better way to teach somebody that this was

24   not an online anonymous back and forth chat world than by

25   having the FBI come to your house, by having a civil judgment

M5B5speS

1    entered against you, by being on pretrial release for 15

2    months, and by pleading guilty in open court to a federal

3    felony.  That is how we intervene.  It is how we teach Jeremy

4    that he was wrong before.  To suggest that none of those things

5    have value or taught him anything or would stop him, I think,

6    undervalues what we all do here every day.

7            And just to make one additional point about how

8    unregulated and out-of-control these markets were, the place

9    where most of the investor money was traded was on a platform

10   that's called BitMEX.  In the last few months the U.S.

11   Attorney's office here in the Southern District of New York

12   arrested the founders of BitMEX because the platform itself, it

13   turned out, was illegal.  The way they structured it was in

14   violation of federal laws.  And now those people have pled

15   guilty and they're pending sentencing I think in front of Judge

16   Koeltl.

17           So I say all of this to say back in 2017 and 2018 this

18   new market, things were swirling around and people made a lot

19   of mistakes but the government has stepped in, they've shut a

20   lot of them down to your Honor's question, I guess, about doing

21   it again.  They have been, I think, trying very hard to bring

22   regulation into these places.  And so at least that platform,

23   for example, is gone.

24           And to that end, despite how unreal it felt, despite

25   how unregulated it was, Jeremy knows and completely accepts

M5B5speS

1    that real people lost real money.  There has never been any

2    question about that.  He has never disputed the restitution

3    amount, he entered willingly into the restitution order, and

4    this is also, I think, distinct from a lot of the fraud cases

5    your Honor sees in this building in that the FBI -- the

6    government's narrative is not that Jeremy had a lavish

7    lifestyle or stole the money and kept it or lined his pockets

8    or used it for something in particular.

9         I heard both the victims today speculate that they

10   think it is in some magical fund somewhere.  It is not at every

11   sentencing where I find myself in alignment with the FBI but

12   the FBI has dug really deep and very thoroughly and I think

13   they feel strongly -- I have spent a lot of time on the phone

14   with the agent and the prosecutor -- that the money doesn't

15   exist, it was lost in the markets, it was re-invested in the

16   kind of chaos of the downfall of the fund and some of it was,

17   as one of the victims just mentioned, some of it was -- some of

18   the money that came in was used to pay off other investors.

19   That's part of the fraud here.  But Jeremy doesn't have it.  He

20   is living alone in his parents' house, broke.

21        It is rare in a case I think that I would spend this

22   much time talking about the victim statements both here in

23   court and the ones that were submitted and we absolutely accept

24   that the hardships incurred were real, but I do want to talk

25   about some of the facts that I think it's part of my job to

M5B5speS

talk about some of the facts in those letters that are salient

to sentencing.  And the first is this:

Jeremy did misrepresent his trading successes.  But he

really did not ever misrepresent who he was.  He was a

21-year-old college dropout with no financial training.  He

didn't pretend to have gone to business school, he didn't claim

he was 35 years old.  He was a guy who was good at crypto

trading on the Internet.  And the investors knew exactly who

they were dealing with.  Mr. Lee said to your Honor the same

thing he wrote in his letter:  "When I met him, I was surprised

to meet a very young, introverted trader, without a lot of

professional experience."  That's a completely accurate

assessment.  They knew who he was.

Second, many of the investors were older than Jeremy

by at least a decade and they were far more sophisticated.

They were the ones with financial training and experience and

McKenzie on their résumés.  Jeremy was a philosophy major who

got through six semesters at knew, NYU.  And I think that that

matters because there is this duality in the letters where on

the one hand you have people like Mr. Truque saying we saw what

he was doing, it was illegal, we told him it was illegal, we

warned him it was illegal, but they were also giving him money

to invest.  And in Mr. Truque's letter he said, "It was with no

formal contract or guarantee between him and I."  I think that

many of the victims, exactly like Jeremy, were just hoping this

M5B5speS

1    was all going to work out.  They were excited about

2    cryptocurrency and everybody made a lot of mistakes.  That

3    world was too optimistic and too informal and too presumptuous

4    but it wasn't exclusive to Jeremy.

5            THE COURT:  And one person, from what I understand

6    here, was lying about it.

7            MS. LEVINE:  That's right.  But I think that the lies

8    in this case -- and he did do that.  I have said so and your

9    Honor is absolutely correct, but the lies were in the same vein

10   of trying to make people money in this market.  It wasn't so he

11   could take tropical vacations.  He was making investments,

12   there is no question about it.  The FBI agrees with that.  He

13   was doing it badly and then incentivizing people to give him

14   more money based on false information and that's the crime.

15   That's the crime.  But it was to -- it was because he believed

16   the hype, it is because everybody -- everybody -- thought

17   crypto is going up, everyone is going to make money if we do

18   this.  And it was stupid and it was extremely naive.  And in

19   Jeremy's case, because of the misrepresentations, it was

20   criminal but it was not -- it certainly didn't start as

21   malicious, it started from trying to make real people real

22   money.

23           THE COURT:  But it certainly, at some point, got to be

24   quite malicious, didn't it?

25           MS. LEVINE:  So I think that's right but I still think

M5B5speS

1    the outcome was quite malicious.  I still think at no point did

2    Jeremy think, man, I'm going to hurt these people.  To the

3    contrary.  He thought, I'm overwhelmed, I'm filled with

4    anxiety, I have no idea how to get out of this, and I am going

5    to freak out and say whatever is the easiest thing to make

6    people not be mad at me until tomorrow.  And that's not really

7    malice.  It's thoughtless and it is stupid but it is not malice

8    and I do believe there is an important line there that

9    distinguishes Jeremy from a lot of other fraud cases that your

10   Honor sees.

11          And there is just this whole world was just so risky.

12   I heard the victims talk about the risks inherent in the crypto

13   markets and I think we can't appreciate, I think unless maybe

14   we were there doing it, the fever level of the crypto fever

15   that had seized everyone.  You know, these markets were

16   being -- like some of these online chat rooms, they're going 24

17   hours a day, people from all over the globe are chatting and

18   posting and chatting and posting and I think it was a lot of

19   wishful thinking and I think that a lot of people got carried

20   away and Jeremy not only did those things, it was wishful

21   thinking and carried away but also crossed the line.  He

22   crossed the line by posting false information and for that he

23   is now a felon for the rest of his life.

24          But I will tell you that in reading all of the

25   discovery in this case, all I kept thinking about was this

M5B5speS

adage like it is just too good to be true.  Right?  Everybody

from the investors to the BitMEX trading people to Jeremy, had

this kind of wishful thinking that even in the victim impact

statements your Honor read there is kind of two themes, there

is the victim saying here is the money I lost and here is the

hypothetical possible amount of money I might have had if they

had stayed in the market.  Right?  Even today there is this

idea that crypto is going to solve everyone's financial

problems and I think that's just not accurate.

        Then, of course, the last thing I will say about the

victim impact letters, I think it is absolutely incumbent upon

me to point particularly to Exhibit 13, which is one of the

letters provided by the government in which that victim said,

very clearly, that he does not think that Jeremy should go to

prison.  He said -- and I will quote here, "I know that people

make mistakes and sometimes cannot assess the implications of

any actions in advance.  The accused is, if I remember

correctly, several years younger than me, just 22 years old at

the time of the crime, and I would be ashamed if I did not

believe in a second chance for the person concerned.  I don't

want a stranger to me on the other side of the globe to spend a

big part of his life in prison."  And that, of course, brings

me to one of the mitigating factors I discussed in my letter

which is Jeremy's age.  And I'm not suggesting that he wasn't

capable or competent of committing this crime.  He did do so as

M5B5speS

1    a fully-fledged legal adult and he has taken responsibility for

2    that by pleading guilty, but as I wrote in my letter, we do

3    know that adolescence, in terms of brain maturation, continues

4    until the age of 25; that at the time Mr. Spence committed this

5    crime at 21 years old there is a different -- the part of your

6    brain, the prefrontal cortex that has the long-term judgment

7    that can see long-term consequences is not fully developed.

8    And I think that places him today, based on the lapse in time,

9    in a different place not only in his life, in his family life,

10   in his personal life, but in his neurological life.  I think he

11   is at a different phase as he stands here today.

12             And, you know --

13             THE COURT:  Would you say the same thing about someone

14   of the same age who walked into a bodega, put a gun to the head

15   of the cashier, and blew his brains out?

16             MS. LEVINE:  I think if they were below the age of 25

17   I would say that that person's immaturity, their brain

18   immaturity contributed to their decision.  That's not to say

19   they shouldn't also be held accountable for their crime but are

20   they the same as a clear-thinking adult?  No.

21             And I think actually you see that because we don't

22   see -- I don't see a lot of cases where my client is the

23   youngest and kind of least sophisticated of the world that's

24   around them.  Right?  We are often dealing with the person that

25   is the most culpable, the person that should have known the

M5B5speS

1    most better, and in this case that's really flipped on its

2    head.  And I think that we believe that people should mature

3    with age.  Big picture, I think the statistics of the

4    Sentencing Commission bear that out and in particular in this

5    case we know that some of his conduct just wreaks of how young

6    he was and how silly he was and how naive he was.

7              But, having said that, I think Jeremy has some good

8    qualities.  I think he had some good qualities then and now

9    and, frankly, he should have known better.  Just because he is

10   naive or gotten in over his head is not an excuse for

11   exercising poor judgment, it is just a piece of the puzzle.

12             I think that as your Honor sits here and evaluates the

13   3553(a) factors together, one thing the Court can think about

14   is Jeremy's potential for the future.  He is a smart kid, there

15   is no question that he has intellect.  I think that is

16   well-documented.  He has just a handful of semesters between

17   him and a bachelors degree.  He is eager to go back to college,

18   he wants to study science.  He wants to have nothing do with

19   finances or economics, really, ever again.  He wants to work.

20   He is a person who knows how to work.  He was a busboy starting

21   at age 14.  He appreciates the value of a dollar and he is

22   going to go back to work, he is going to work I think for most

23   of his adult life to pay off the victims in this case.

24             Now, the government suggested in their letter that

25   because we pointed out the fact that Jeremy is middle class

M5B5speS

that we are asking for some kind of middle class sentence and
that is, of course, not the case.  We are doing what 3553(a)
demands which is to say that Jeremy is lucky to have some
structures and some support in place that will help him going
forward.

He has a safe place to live.  He has people who love
him.  He has skills that will make him employable in the
future.  He has a college degree that will make him further
employable in the future.  These are the kinds of things that
can give the Court confidence that he can get back on track.

And there is no factor I think more relevant to that
analysis than his parents.  His parents are sitting in the
front row next to his twin sister.  They came here with him
today.  They all drove together from Rhode Island.  And in the
letters they wrote to you and that their extended family wrote
to you there is simply no question that they love him, that
they've watched him throughout this prosecution and the civil
cases that came before it.  They have seen how stressed and
embarrassed and ashamed he is and I think that their hearts
break for this ambitious kid who really, really, really screwed
up.  And despite appreciating and knowing and fully
understanding how badly he screwed up -- which he did --
they're absolutely certain that he is going to get back on
track, that he can do that, and he will literally do so under
their watchful eyes.  He lives in their house, they are

M5B5speS

1     financially supporting him.

2              And then last, the last mitigating factor that I have

3     to talk about, of course, is Jeremy's current medical crisis

4     and perhaps I should have started with this rather than ended

5     with it because I will tell you that of all the things I'm

6     talking about today, this is the one that Jeremy and his family

7     are the absolute most concerned about and that is his need to

8     get treatment for his recent cancer diagnosis.  That's the

9     absolute most important thing on his mind and the mind of his

10    family.

11             Your Honor already knows that in March Jeremy had

12    tests followed by emergency surgery to remove what turned out

13    to be testicular cancer.  They found a germ cell tumor.  They

14    tested it.  It was malignant.  And a cancer diagnosis is a lot

15    for anyone, but it is particularly so for an otherwise healthy

16    25-year-old.

17             He is lucky to be receiving very good medical care and

18    cancer like this, as I understand it, has a good prognosis if

19    you get the right treatment and if you stay vigilant and that's

20    what he has been doing.  He has been having regular scans, he

21    has been going back to the oncologist, he has been going back

22    to the surgeon, he has been going back to the urologist because

23    that's how you monitor if the cancer has spread or if it comes

24    back.  And I wrote to your Honor earlier this week that just

25    this last Friday, based on a review of the most recent CT

M5B5speS

1    scans, the oncologist said that Jeremy needs chemotherapy and

2    that round of chemo therapy is scheduled to begin on May 23rd,

3    which is in, of course, about 12 days.

4            THE COURT:  What is the duration of the planned

5    course?

6            MS. LEVINE:  Yes, your Honor.  It is scheduled for

7    what they call a 21-day cycle.

8            As I understand it from reading his medical records,

9    because of the side effects of chemo and monitoring his

10   progress, they would want at least two months following that to

11   see if it worked.  And so, in the event the Court is

12   contemplating a jail sentence, we would ask for a surrender

13   date of no earlier than September 1.

14           THE COURT:  Is there any detectable evidence of spread

15   outside the portion of his anatomy that was removed?

16           MS. LEVINE:  So as I understand it there was some kind

17   of notation on the most recent scan that was part of the

18   recommendation to now do chemo.  We weren't sure that he was

19   going to need chemo and that was a more recent decision based

20   on a more recent scan.

21           Now, look.  I think his prognosis overall is good.

22           THE COURT:  That I understand but my question was a

23   very specific one.

24           MS. LEVINE:  I'm sorry.

25           THE COURT:  It was:  Are you in a position to tell me

M5B5speS

1    today whether there is any evidence of any spread outside the

2    portion of his anatomy that was removed surgically?

3            MS. LEVINE:  So I will read from the medical record

4    that was faxed to me on Friday that said -- this is a quote --

5    note made of CT scan results which showed presence of small

6    pulmonary nodules.  Cannot rule out disease involvement but

7    seems unlikely given normal tumor markers.  Will need to be

8    re-assessed on subsequent imaging.

9            THE COURT:  OK.  So that says conceivable, unlikely.

10           MS. LEVINE:  That's right.

11           THE COURT:  But indeterminate.

12           MS. LEVINE:  Correct.  And then what follows is the

13   recommendation for chemo.

14           THE COURT:  OK.  I understand that.

15           MS. LEVINE:  Yes.

16           And, of course, there is a short-term plan of action

17   which I just described to your Honor.  But, in terms of

18   long-term management, these are scans he is supposed to have

19   every three months.  I understand from his family at that

20   yesterday's meeting with the urologist that if he were at

21   liberty, they would expect him to come in every four months for

22   at least the first year to get the same CT scans to make sure

23   that nothing has changed.  And your Honor certainly doesn't

24   need me to tell you that the chances of that level of vigilance

25   and maintenance are unavailable in the BOP.  I think having

M5B5speS

1   someone taken from an institution to get a scan is one of the

2   absolute hardest things I have ever tried to effect for a

3   client.

4           THE COURT:  I believe that at Butner and one or two

5   other places they can do it in the institution.

6           MS. LEVINE:  So I think if he were designated to a

7   medical center, that's correct, and I think otherwise we saw

8   this in the middle of COVID, that all the specialists, the

9   people who come in and do extra things, it was just paused

10  indefinitely.

11          THE COURT:  Yes, but --

12          MS. LEVINE:  But hopefully they're back up and

13  running.  I don't know that information for sure but I guess

14  this is how I would say it:  If he is out in the community, we

15  know with 100 percent certainty that he will get follow-up

16  medical care, and in the BOP that becomes a lot grayer.  And,

17  of course, medical treatment is one of the 3553(a) factors that

18  the Court is allowed to consider.  And, in fact, I think people

19  with ongoing medical crises that is often a particular reason

20  for variance, that is a reason that is often used by Judges in

21  this district.

22          And I promise I will sit down soon, I just have a

23  couple more small things.

24          The first is the statute that Jeremy pled guilty to is

25  a rarely used one in this district.  I only know -- I was only

M5B5speS

able to locate one other case where someone pled to this
specific statute and that is a case we cited in our papers,
U.S. V Thompson where that defendant was given a
non-incarceratory sentence and supervision.  We also cited to a
number of cryptocurrency fraud cases where people who did kind
of similar conduct were cases that were brought by the CFTC in
a civil context and not even -- there were no criminal charges
whatsoever and therefore there were no criminal penalties.

         And then I think I also have to briefly comment on the
two cases that the government included in their sentencing
letter where they cited to two cases where there were really
substantial sentences for first-time offenders, it was in the
range of 40-some-odd months.  But Jeremy couldn't be more
different than those defendants and I think the dissimilarities
are clear.  The first is they were far older and far more
sophisticated than Jeremy.  The defendant in *Wells* was 42.  The
defendant in *Schwartz* was 73.  The schemes went on for much
longer.  In *Wells*, the fraud took place over six years.  And in
*Schwartz*, I have to draw this distinction for your Honor:  That
defendant pled guilty here in federal court, in 500 Pearl to
federal fraud charges, and then he kept committing fraud.  The
government postponed the sentencing so that the sentencing
Court could address his ongoing illegal acts.  He didn't learn
his lesson, he wasn't deterred, he clearly didn't actually
accept responsibility.  And Ms. Magdo, in that case, advocated

M5B5speS

1    for a substantial jail sentence.  And I just think this case

2    stands in stark contrast to someone like that.  Your Honor

3    knows cases like that.  You have seen fraud cases like that.

4    You have seen fraud defendants like that.  And there is no

5    reason to think -- your Honor is right that I can't prove he is

6    not going to ever do anything bad ever again but there is

7    absolutely no indication that he will.  All of the things we

8    look at --

9              THE COURT:  I think you have covered that.

10             MS. LEVINE:  Thank you.

11             And then the last thing I would say is the Court has

12   15 months of pretrial compliance to look at.  It is that kind

13   of compliance of acting with your, like, showing the Court what

14   you can do, right?  Not telling, not promising, but actually

15   showing the Court.  And as I mentioned briefly earlier, I do

16   think there are a number of narrowly-tailored conditions that

17   the probation office has at its disposal for financial crimes.

18   One being approving lines of credit, a search condition

19   regarding his financial condition, a work condition, a

20   restitution condition, of course.

21             And, look.  Jeremy has a ton of rebuilding to do.  He

22   has a long road ahead of him and he has taken the first steps

23   on that road by pleading guilty, by expressing remorse.  In his

24   letter to the Court he talked about the relief he felt when the

25   agents came and put him in handcuffs because the rubber was

M5B5speS

1   finally meeting the road and he has lived with that for more

2   than a year.

3          And so, your Honor, we submit that all of these

4   factors together, under 3553(a), do balance in favor of a

5   non-incarceratory sentence, with home detention, with community

6   service, while he lives at home with his parents, while he

7   slowly re-builds, while he finishes college, and gets medical

8   help for the cancer that he is already battling.

9          THE COURT:  Thank you.

10          Mr. Spence, you have a right to speak before you are

11   sentenced.  Is there anything you would like to say?  If there

12   is, you can go over to the lectern where Ms. Levine was.

13          THE DEFENDANT:  Your Honor, a few years ago I entered

14   a world that I was completely unprepared for.  I made many

15   mistakes and I am sincerely mortified by my actions.  I am

16   deeply, deeply sorry to my family and the victims that were

17   hurt because of me and I assure you that nothing like this will

18   ever happen again.  I am very sorry.

19          THE COURT:  Thank you.

20          Ms. Magdo?

21          MS. MAGDO:  Thank you, your Honor.

22          THE COURT:  You may proceed when you are ready.

23          MS. MAGDO:  Thank you.

24          Your Honor, I would like to begin by briefly

25   addressing a few points that Ms. Levine made in her address to

M5B5speS

1    the Court that I think are -- they're a little bit of a red

2    herring.

3          So the fact that Mr. Spence plead to the top count,

4    which was commodities fraud, is really of no moment.  The

5    second count in the indictment was wire fraud.  Commodities

6    fraud is essentially a wire fraud that involves commodities and

7    we try to charge -- have someone plead to the charge that most

8    accurately reflects the conduct.

9          With respect to the defendant's age and his health,

10   those don't really put him outside the heartland of defendants.

11   Unfortunately, as the Court is aware, we see so many people in

12   their 20s appear before the Court in a range of cases.

13         With respect to his health the government, as we made

14   clear in our submission, we don't oppose a delayed surrender

15   date so that this can be taken care of but this is not expected

16   to be a long-term, ongoing issue, and so many inmates that BOP

17   has do have long-term issues that are dealt with.  So,

18   respectfully, I would say that the health issue can be dealt

19   with and then a period of incarceration would be appropriate.

20         Not only is Mr. Spence not outside the range of a

21   typical defendant, he is actually better off than most people

22   who are in his seat.  He had a loving and supportive family in

23   a middle-class home.  He had teachers who cared about him.  He

24   went to an elite private college.  And although it's implied

25   that his major -- philosophy -- didn't prepare him for trading

M5B5speS

cryptocurrency, I believe that people who study philosophy also
study ethics and moral theory.  And it was definitely something
that, along the way, with all the advantages he had, he should
have known better.

He was surrounded by -- or at least by two experienced
people who considered him a friend and who did everything they
could do try to help him.  They went into a lot of detail on
that so I won't belabor that point, but these were not all
anonymous strangers to him.  But, even if they were, that's not
an excuse to lie, to cheat, to steal.  Moreover, this was not a
one-time slipup.  It didn't last six years or 10 years, but
this fraud lasted over a substantial period of time where
Mr. Spence had many opportunities to come clean.  And he chose
not to.  He didn't start this off as a non-profit for the
benefit of the investors, he did this in order to also make
money for himself.  And he didn't lead a particularly lavish
lifestyle, it is true, but that's because he was losing money
from the get-go.  He was just trying to plug the holes.  He was
soliciting investments at a point where he had already lost
nearly all of the investor money and so that was because he
could pay back the earlier investors.  Those earlier investors
were clamoring for their money back and he did not want to be
discovered.

The things that Mr. Spence did in order to cover up
the crimes really belie the claim that he is not a

M5B5speS

1    sophisticated individual.  He, throughout the scheme, provided

2    fake returns to the administrators so that they could pass them

3    on to the investors.  Once the administrators got suspicious

4    he, on two occasions, had a video of himself apparently logging

5    into the account that contained the investor funds and he was

6    able to have it display a fake balance that didn't actually

7    exist.  I am sure the FBI understands how he did that but I

8    still don't understand how he did that.

9         And another thing that defense counsel mentioned is

10   that the loss amount is too heavily emphasized in fraud cases

11   in the sentencing guidelines.  While I agree that might be true

12   in certain cases where it is a victimless crime, it is a fraud

13   on the market, it is some sort of an abstract loss.  Here, the

14   loss was not abstract.  Every dollar that is in the loss amount

15   came out of the pocket of an individual who was a parent, or a

16   spouse.  These were real hardships for real people.  And I

17   think your Honor can see that from the 15 letters that were

18   submitted and the two individuals who came to speak here today.

19   I can also represent that there were other victims who wanted

20   to write to the Court but who did not want their identities

21   revealed because of the shame and the embarrassment and the

22   guilt that they felt having been victimized here.  And that is

23   consistent with what is in the letters that were written by the

24   victims.  They talk about both the enormous economic impact

25   that this crime had on them, they describe losing half, 80, 90,

M5B5speS

1    or a hundred percent of their life savings.  One individual was

2    forced to sell his entire personal IRA 401K in order to just

3    pay his living expenses.  And perhaps, more profoundly, the

4    victims repeatedly describe feelings of depression, anxiety,

5    stress.  They continue to suffer nightmares years after this

6    happened.  They themselves feel shame, humiliation, and they

7    describe losing the trust of the people around them and losing

8    confidence in themselves.

9            With respect to specific deterrence I am not alleging

10   in any way that the defendant has committed any misconduct

11   while he has been on supervised release, but the idea that

12   during the time that he is on probation and then thereafter,

13   when there is absolutely no supervision that the defendant

14   couldn't go back and commit another crime like this, maybe he

15   is not so inclined but whether practically he could do it, the

16   answer to that seems pretty straightforward.

17           There are countless such scams and most of the

18   perpetrators are never caught.  This type of fraud will always

19   exist whether it's a boiler room -- and by this type of fraud I

20   mean an individual soliciting others, mostly unknown to him, to

21   give them money, perhaps with promises that should be perceived

22   as too good to be true, but everything from boiler rooms to

23   romance scams to the IRS impersonators.  This type of fraud

24   will always be with us, it will just change form.

25           Defense counsel also mentioned that the defendant has

M5B5speS

1   suffered from the act of being arrested, the fact that he has

2   had to be under pretrial supervision and live with his parents,

3   that the media attention and the reputational harm that he

4   suffered since being arrested but I think it's clear that those

5   are not a defendant's punishment, those are effects and they

6   are negative but those themselves are not punishment.

7           And I think really that's what I would like to end

8   with, is that in this case, the need for both specific and

9   general deterrence but also the need for just punishment.  A

10  non-custodial sentence would send an absolutely wrong message.

11  It would be less than a slap on the wrist, it would be more

12  like a gentle tap; it would be unfair and unjust to the over

13  100 victims who have lost not only financially but who have

14  suffered emotionally.  And, your Honor, I respectfully submit

15  that a sentence with a substantial term of imprisonment is

16  warranted here.

17          Does the Court have any questions?

18          THE COURT:  No.  Thank you.

19          Mr. Spence, please rise for the imposition of

20  sentence.

21          Let me begin by making a couple of observations.  I

22  was struck in reading Ms. Levine's memorandum by a few things.

23  I'm not going to mention all of them.  She did a very good job.

24  One thing I was struck by was the stupidity of the people you

25  gulled into putting money with you.  People invest in a

M5B5speS

1    squiggly line?  Give me a break.  People send money to somebody

2    identified on the Internet as Bruce Halftroll, or maybe Bruce

3    Halftroll was the fellow sending the money?  To describe this

4    as the wild west does a substantial injustice to the wild west.

5    That, at least, was kind of civilized if you didn't get shot.

6           Now that is not to diminish the harm that these people

7    suffered at all.  The victims in cases like this, they suffer

8    in real terms.  They have not only the fraudster to blame for

9    it, in a lot of cases they have themselves to blame for it as

10   well but that doesn't mean it is any less serious.

11          The other thing that really stood out was this

12   sentence because it really spoke to me:  Speaking of why you

13   launched into the provision of false information and hiding the

14   losses Ms. Levine wrote:  "He believed that if people kept

15   investing, he could make everyone whole."

16          The number of times that I have sentenced defendants

17   of whom that could have been and was said in 27 and a half more

18   or less years here, is astonishing.  It astonishes even me and

19   I was here for every one of them.  You think Bernie Madoff

20   thought that?  I do.

21          I think it is an occupational hazard of people on Wall

22   Street.  People get started, they cut this corner, they cut

23   that corner -- not all of them, of course.  Pretty soon there

24   is a problem.  They start lying to cover the problem, start

25   gypping people out of other money to try to pay to cover the

M5B5speS

1    problem, and pretty soon the FBI is at the door.  Over and over

2    and over again, through my whole career on the bench, through

3    my whole career as a lawyer, through everything I know about

4    the financial markets in this country and similar economies and

5    modern economic history, it is the never-ending story.  But it

6    is criminal and, Mr. Spence, I accept that you are a smart kid,

7    and you were very well educated, and you had loving and moral

8    and ethical parents and you knew -- you knew to a certainty

9    when you started lying, when you started stealing from one to

10   pay the other -- that it was wrong.  There was no doubt in your

11   mind.

12          You know, sometimes I see young defendants your age

13   and younger who come out of far less privileged circumstances

14   and who have been implicated in crimes where there was real

15   wrong done but where, in some twisted way, you could get your

16   mind around the concept that maybe they just thought that's the

17   way you lived in their community.  I can't say that about you.

18   This was a serious crime.  You committed it deliberately.  You

19   didn't do it once.  You did it over and over again for months.

20   You had a million opportunities to say, "wait a minute, I'm out

21   of here, the time has come to go see my dad, get a lawyer, and

22   fess up."  Never happened.  You didn't do it until you were

23   caught.

24          Ms. Magdo struck, to my way of thinking, all the right

25   notes.  I am asked to take into account the 3553 factors.  Of

M5B5speS

1    course I do, but they don't all cut your way.  I'm obliged to

2    impose a sentence that reflects the seriousness of the crime.

3    You took people out of significant parts of their life savings.

4    You made their lives and their emotional health far worse than

5    it should have been.  What is the right answer to reflect a

6    just punishment for that and the seriousness of the crime?  I

7    refer also to just punishment.  I'm very sympathetic about your

8    medical condition.  We will talk about that in a moment.  It is

9    a terrible thing.  I hope the prognosis is as good as I have

10   been led to believe it is.  I genuinely do.  But to have you

11   walk out of here after what you did?  I don't see it.

12   Moreover, I have to consider imposing a sentence that others in

13   the financial community, either the real one -- I shouldn't say

14   the real one because I am behind the times -- even the one I

15   grew up with on Wall Street without this electronic never-never

16   land, that there are real life consequences to these kind of

17   shenanigans and they are serious and if they get caught,

18   they're going to pay a serious price.  And that's independent

19   of whether I believe you are ever going to do anything like

20   this again.  Whether you will, I really don't know.  There are

21   some times when I come to sentence a defendant where it is

22   reasonably clear to me that the chances of recurring wrongdoing

23   are minimal.  I'm told that's true in your case.  I understand

24   you behaved yourself, as far as anybody knows, on pretrial

25   release.  But I don't really know that and I don't know whether

M5B5speS

that's because there is real remorse and you have learned your

lesson, or whether it is because you understand that getting

caught engaging in shenanigans during this period is about the

worst thing you could possibly do.  But that once the sword of

Damocles is no longer hanging over your neck, maybe there is a

relapse.  I just don't know.  I am undecided in my mind about

that, I don't have enough information.

        The one thing that I am inclined to agree with in

terms of a factor arguing for a lower than guideline sentence,

is that I, too, am critical about the focus on the loss amount

in the table that appears in the guidelines and plays what is

often a disproportionate amount, a disproportionate role in

determining a sentence in an economic crime like this.  I have

commented about that previously in sentencing.  I understand it

has no real empirical basis, it is just what some committee

negotiated and so I don't attach too much weight to it.

        So, in the last analysis I am going to impose a

sentence somewhat the below the sentencing guidelines but I do

it principally on the basis of my concerns about the

importance, in the guideline computation, of the loss amount,

and I am trying to achieve the objectives of the Sentencing

Reform Act to which I adverted.

        It is the judgment of this Court that you be committed

to the custody of the Attorney General of the United States, or

his designee, for a term of imprisonment of 42 months; that you

M5B5speS

1   thereafter serve a term of supervised release of three years;

2   and that you pay the mandatory special assessment of $100.

3         It is further adjudged that you pay restitution in the

4   amount of $2,847,743 as is more fully set forth and on the

5   terms more fully set forth in the consent order of restitution

6   that I am signing here this afternoon.

7         The term of supervised release will be subject to the

8   mandatory, the standard, and the special conditions of

9   supervision set forth at page 21 through 23 of the presentence

10  report which you have testified you have read completely.

11        Does either counsel feel it necessary for me to read

12  those conditions *in haec verba*?

13        MS. MAGDO:  Not from the government, your Honor.

14        MS. LEVINE:  No, your Honor.

15        THE COURT:  All right.

16        Now, I advise you that to whatever extent you haven't

17  waived it, you have the right to appeal from the judgment

18  imposing this sentence.  If you wish to appeal, you must file a

19  written notice of appeal not later than 14 days after the date

20  on which judgment is entered, which would probably be tomorrow.

21  If you wish to appeal and you can't afford to pay the fees

22  necessary to do so, you have the right to move for permission

23  to appeal as a poor person.  If you make such a motion and it

24  were granted, you would be permitted to appeal without payment

25  of the fees, and if you couldn't afford a lawyer, a lawyer

M5B5speS

1    would be appointed for you at government expense.

2              You may be seated.

3              I do want to say to Mr. and Mrs. Spence, there is no

4    joy in doing this -- and to your sister -- there is no joy in

5    doing this.  This is a duty that just, unfortunately, falls to

6    us.  And I know it will be hard on the family and that happens,

7    regrettably, almost every time somebody commits a serious crime

8    and winds up being sentenced for it.  It is the fault of the

9    offender and not anybody else.

10             Now, I am receptive to delaying the surrender because

11   I want Mr. Spence to have the medical condition properly tended

12   to and I do not have excessive confidence in the medical care

13   in the Bureau of Prisons through a great deal of experience

14   over the years with people over whom I have had jurisdiction.

15             I am inclined to set a surrender date in the middle to

16   latter part of September to err on the side of too much

17   opportunity for treatment rather than too little.  So absent

18   objection, I will continue the defendant on bail on the

19   condition that he surrender to the Bureau of Prisons for the

20   service of his sentence at the institution designated by it for

21   that purpose on the date and by the time specified by the

22   Bureau of Prisons which shall not be earlier than September

23   19th.  Compliance with that requirement is required because I

24   am ordering you to comply with it and because I am making it a

25   further condition of your bail.  If, for any reason, you don't

M5B5speS

1    comply, you could be prosecuted for contempt of Court and for

2    escape, both of which could be serious additional matters

3    leading, perhaps, to additional penalties.

4            Now, I am going to require that by September 12th,

5    unless the defendant has been designated to surrender on or

6    after the 19th and the defendant intends to do so without an

7    extension, the following:  I would consider, on medical

8    grounds, a possible postponement of the surrender date if the

9    defense thinks it is medically necessary or appropriate.  But

10   I'm not an easy person on this and what I would want to have by

11   September 12th, if the defendant is going to make such a

12   request, is complete information on the status of the cancer

13   including staging, the radiological reports, the pathology

14   reports, and the proposed treatment plan.  I'm not an

15   uninformed consumer of such things, regrettably not for any

16   personal reason.  And if I have questions, of course, you will

17   hear about them.

18           Anything else?

19           MS. MAGDO:  Your Honor, the government moves to

20   dismiss the open count in the indictment.

21           THE COURT:  Granted.

22           MS. LEVINE:  Your Honor, may I have one moment with my

23   client?

24           THE COURT:  Yes.  Sure.

25           (Defendant and counsel conferring)

M5B5speS

1          MS. LEVINE:  Thank you.

2          Your Honor, just briefly.  First is we would ask that

3     the Court, just with regard to designation, we would ask for a

4     recommendation that Mr. Spence serve his prison term as close

5     to Rhode Island, which is his address, to facilitate family

6     visits.

7          THE COURT:  Look.  I will consider that in September

8     and the reason I am putting it off is if the circumstances

9     warrant, I would recommend a medical facility, and that might

10    be inconsistent.  Now, I suspect it isn't because I think FMC

11    Devens is right there, it is right close to Rhode Island, but

12    I'm not sure whether that would be the best place for him if

13    there is really a medical situation.  So if you want to renew

14    that request in September, do so.

15         MS. LEVINE:  Right.  That's exactly what --

16         MR. KELLY:  May we confer briefly?

17         THE COURT:  Yes.

18         (Counsel conferring)

19         MS. LEVINE:  So your Honor, we are having an internal

20    conversation about exactly what your Honor just addressed,

21    which is I think it is premature for us to know if we would be

22    requesting a medical center because it is going to depend a lot

23    on how things progress.

24         THE COURT:  Sure.

25         MS. LEVINE:  And I -- my colleague suggests that we

M5B5speS

1    ask the Court that today's judgment, the current judgment say

2    designated near Rhode Island, and in the event that he need no

3    further medical care when he reaches the BOP, the judgment

4    would lie as is.  And in the event that the future developments

5    with regard to his medical care --

6             THE COURT:  We can amend the judgment.

7             MS. LEVINE:  -- we can amend the judgment at that

8    point.

9             THE COURT:  That's OK.

10            MS. LEVINE:  Thank you.  Nothing further, your Honor.

11            THE COURT:  Anything further?

12            MS. MAGDO:  No.  Thank you, your Honor.

13            THE COURT:  Thank you, all.

14                              oOo

15

16

17

18

19

20

21

22

23

24

25